IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


JOHN WILLIAM SCHARNHORST, III                                    PLAINTIFF


        v.                        Civil No. 5:22-CV-05243


CHIEF DEPUTY JAY CANTRELL; CAPTAIN NOLAN AKE;
SERGEANT C. PINEDA; SERGEANT J. ALLEN;
CORPORAL T. MULVANEY; DFC GRANADOS; DFC H. EOFF;
CPL. L. CRADDUCK; CPL. D. NUNZIATO; CPL. D. ROLLINS;
CPL K. TURNER; DFC SCHMITT; DEPUTY REDMOND;
DFC MONTANO; DFC DRUMRIGHT; DFC DERSAM; DFC E. FRYE;
DFC CPL TATE; DFC R. PHIPPS; SGT. FOSTER; and CPL. CORLEY        DEFENDANTS


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, John Scharnhorst, III, filed this 42 U.S.C. § 1983 civil rights action *pro se* and proceeds *in forma pauperis.* (ECF Nos. 1, 3). This is the seventh 42 U.S.C. § 1983 lawsuit Plaintiff has filed in this District in as many months. *See also Scharnhorst v. Cantrell, et al.*, 5:22-CV-05238-TLB-CDC (W.D. Ark. Dec. 14, 2022); *Scharnhorst v. Cantrell, et al.*, 5:22-CV-05232-TLB-MEF (W.D. Ark. Nov. 28, 2022); *Scharnhorst v. Cantrell, et al.*, 5:22-CV-05218-TLB-CDC (W.D. Ark. Oct. 19. 2022); *Scharnhorst v. Cantrell, et al.*, 5:22-CV-05176 (W.D. Ark. Aug. 30, 2022); *Scharnhorst v. Helder, et al.*, 5:22-CV-05167-TLB-CDC (W.D. Ark. Aug. 10, 2022); *Scharnhorst v. Cantrell, et al.*, 5:22-CV-05138-TLB-MEF (W.D. Ark. July 15, 2022).   Pursuant to the provisions of 28 U.S.C. § § 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned and the matter is now before the Court for preservice screening under 28 U.S.C. § 1915A, *et seq*., of the Prisoner Litigation Reform Act

("PLRA").   Pursuant to 28 U.S.C. § 1915A, the Court is required to screen any complaint in which a prisoner seeks redress from a governmental entity or an officer or employee of a governmental entity.[1] 28 U.S.C. § 1915A(a).   The Court has conducted the requisite screening, making the following observations and recommendations.

## BACKGROUND

The Complaint identifies twenty-one defendants in their individual and official capacities and sets forth multiple theories for relief. (ECF No. 1).

Naming Cpl. Tom Mulvaney, Cpl. Landon Cradduck, Sgt. Jacob Allen, Sgt. Pineda, and Dfc. Granados as defendants, Plaintiff first alleges that on March 31, 2022, Cpl. Cradduck refused to deliver a properly addressed letter to Cpl. Mulvaney because Cpl. Mulvaney ordered WCDC staff not to accept mail addressed to him from Plaintiff. According to Plaintiff, he told Cpl. Cradduck that he was violating his rights and, in response, Cpl. Cradduck "struck him in the sternum with his fist and knocked [him] down." (ECF No. 1 at p. 6).   Plaintiff further alleges that on December 7, 8 and 9, 2022, he turned in USPS-issued, pre-stamped envelopes properly addressed to JaNan Arnold Thomas, the lawyer for the Washington County Sheriff's Department, but Sgt. Allen returned the mail to him on December 7th; Dfc. Granados returned the mail to him on December 8th; and Sgt. Pineda returned the mail to him on December 9th.   Plaintiff claims that he has been experiencing problems with his mail at WCDC for a year.

In support of claims against these defendants in their official capacity, Plaintiff reports he

---

[1] Plaintiff was a pretrial detainee at the Washington County Detention Center (WCDC) at the time he filed this action. The factual predicate of this complaint concerns events that allegedly occurred during that period of pretrial confinement. (ECF No. 1 at p. 1). Since that time, publicly accessible Arkansas state court records show that Plaintiff resolved his open Washington County criminal case. *State v. Scharnhorst*, 72CR-21-1768 (Ark. Dist. Ct. Aug. 6, 2021) (Ark. Court Connect). The same court records show that Plaintiff is currently incarcerated at the Benton County Detention Center on new state court charges. *State v . Scharnhorst*, 04CR-23-136 (Ark. Dist. Ct. Jan. 20, 2023) (Ark. Court Connect).

suspects that his mail is being "disposed of and tampered with as a widespread practice." *Id.* at p. 6.  Plaintiff alleges that "far too much of [his] mail has been 'lost' or returned." *Id.*

Plaintiff next claims that Cpl. Tom Mulvaney prevented him from sending mail from February 4 - 8, 2022. (ECF No. 1 at p. 7).   According to Plaintiff, the WCDC will stamp two letters per week at no cost for detainees considered "indigent." *Id.*   Plaintiff alleges that when the stamps he ordered from the commissary had not arrived, he requested that the WCDC stamp his legal mail because the money (for the stamps) already had been deducted from his account. *Id.* Plaintiff claims that even though he told Cpl. Mulvaney that he was a "pro se defendant" and that he was trying to file a "1983," Cpl. Mulvaney refused to stamp his mail, telling him that he was not indigent so he would have to wait to get the stamps he was owed from the commissary. *Id.* Plaintiff claims that this is one example of the "blanket unofficial policy of the Washington County Sheriff's Department to completely deny, disregard and violate detainees' rights." *Id.* at p. 8.

Plaintiff's third claim alleges he tried to order writing paper from the WCDC commissary for several weeks but was told it was "out of stock." *Id.* at p. 9. After filing a grievance, Plaintiff claims he became aware that Daniel Giertz had found some paper; Giertz gave the paper to Cpl. Corley to give to Plaintiff. *Id.*   According to Plaintiff, he asked Dfc. Eoff to obtain the paper from Cpl. Corley but Eoff told Plaintiff that because he is not indigent, he needed to order the paper from commissary. *Id.* After lodging additional complaints, Plaintiff alleges that Sgt. Malone finally brought him the paper. *Id.*   As to this claim, Plaintiff identifies Cpl. Corley and Dfc. Eoff as defendants in their individual and official capacities, claiming that the "deprivation of civil liberties and the pursuit of happiness is a widespread practice that many of the sheriff's deputies take joy in by antagonizing and tormenting, harassing, and depriving detainees of needs and

3

desires." *Id.* at pp. 9-10.

Fourth, according to Plaintiff, detainees who are considered "indigent" are given pencils on Sundays when supplies to indigent detainees are distributed. *Id.* at p. 13. Because Plaintiff is not considered indigent, the WCDC will not give him a pencil on Sundays, but he cannot purchase a pencil at commissary because the commissary does not sell them. *Id.*  Plaintiff claims he has repeatedly asked WCDC staff how he could acquire a pencil, but he never received a satisfactory answer, leaving him to resort to bartering with other detainees and engaging in otherwise prohibited activity to acquire the necessary pencil. *Id.*  Plaintiff alleges that he requested – but did not receive – a pencil from the following defendants named in this claim: Schmitt, Redmond, Rollins, Montano, Drumright, Dersam, Frye, Cpl. Tate, Ofc. Phipps, and Sgt. Foster.

Plaintiff claims he filed grievances about being unable to acquire a pencil and requested that video be preserved of him bartering with other inmates to get a pencil, but his request to preserve video was denied. *Id.*  Plaintiff alleges that Captain Ake is responsible for the "pencil policy" and that under the policy, detainees are not allowed access to a pencil sharpener and are expected to limit their writing to the extent allowed by one 3-inch pencil per week. *Id.* Plaintiff claims that this policy is inadequate because he "journal[s], write[s] letters, file[s] court motions, make[s] charts, graphs and spreadsheets [and] [he] take[s] a lot of legal notes." As to this claim, Plaintiff names the defendants in their individual and official capacity, alleging that "deliberate indifference to the rights and needs of the detainees housed at the WCDC is the backbone of the operational procedure." *Id.* at p. 15.

Plaintiff's fifth claim concerns two encounters with Defendant Dfc. Hunter Eoff. According to Plaintiff, on March 29, 2022, Dfc. Eoff ordered him out of his cell so that he could

conduct a cell search. *Id.* at p. 16.   Plaintiff claims that in the weeks prior, he had been reporting that Dfc. Eoff was being "aggressive" and warned that he was "taunting and provoking detainees and very obviously 'looking for a fight.'" *Id.*   Plaintiff alleges that when he walked out of the building, he and Dfc. Eoff "exchanged heated words about his conduct" and Dfc. Eoff then "shoulder checked" him, striking him in the back with his shoulder and elbow. *Id.* Plaintiff claims Dfc. Vasilopolous witnessed this encounter. *Id.*

During the cell search, Plaintiff claims that Dfc. Eoff: (1) tore the pages of a counter-complaint he had composed in his domestic relations case, 72DR-18-1551 and (2) tore open an envelope addressed to this Court that contained a letter to the Court Clerk complaining that Cpl. Tom Mulvaney and Captain Noland Ake were interfering with his ability to file a "1983 by refusing to complete [his] COIAA." *Id.* at p. 16. According to Plaintiff, the letter was missing from inside the envelope. *Id.*

Regarding the second encounter, Plaintiff claims that a few weeks later, Dfc. Eoff and Dfc. Vasilopolous were escorting him through the facility. *Id.* at p. 17.   According to Plaintiff, because he was concerned that Dfc. Eoff was going to physically assault him again, he asked him to keep his distance, but Dfc. Eoff became "verbally aggressive" and as they passed through the doorway into A-pod where camera coverage is not very good, Dfc. Eoff "stepped on the back of [Plaintiff's] bare ankle and heel with his steel toe combat boot." *Id.* Plaintiff is suing Dfc. Eoff as to this claim in both his individual and official capacities on the grounds that "violating detainees' rights is the widespread commonly accepted operational procedure of the Washington County Sheriff's Department." *Id.*

Plaintiff's sixth claim concerns four separate interactions with different WCDC staff.

Plaintiff claims that on January 6, 2022, he complained to Cpl. Nunziato and another deputy about the leaky toilet in his cell, which had been the subject of numerous grievances, and, in response, Cpl. Nunziato "became extremely aggressive, took on a violent nature and began screaming at [him] to 'shut the fuck up and get back in the fucking house.'" *Id.* at p. 18. Plaintiff alleges that Cpl. Nunziato refers to the jail cells as a "house" in reference to a doghouse, as though the detainees are "dogs." *Id.* Plaintiff further claims that on February 1, 2022, Cpl. Cradduck became angry when he started explaining to him and another officer that there was a race riot brewing and Cpl. Cradduck told him to "shut up, that he wasn't going to listen to [Plaintiff] 'insulting them.'" *Id.* Plaintiff alleges that on February 11, 2022, he was talking about preparing to file a "1983" when the unnamed corporal escorting the medical nurse became furious and yelled at him to "shut the fuck up." *Id.*

On August 2, 2022, Plaintiff alleges that he was in his cell on Q-block when he saw Cpl. Rollins and Deputy Edens facilitating an attorney-client meeting between a different inmate and his public defender. According to Plaintiff, the inmate did not understand what the public defender was telling him, so Cpl. Rollins took out his pen and filled out the inmate's paperwork for him allegedly in violation of the inmate's constitutional rights. *Id.* at p. 19. Plaintiff claims that he was discussing with a third inmate that this practice was a violation of the inmate's constitutional rights, when Cpl. Rollins approached his cell door and started to yell at him to "shut [his] mouth." *Id.* In response, Plaintiff says that he told Cpl. Rollins that "he was a disgrace to law enforcement" and Cpl. Rollins then "reared back and punched the window right in [his] face and told [him] [he'd] better shut the hell up or he'd shut [him] up." *Id.* According to Plaintiff, Cpl. Rollins then stood outside his door for the next ten minutes to ensure that he did not speak during

the next inmate's meeting with his attorney. *Id.* Plaintiff claims that Cpl. Mulvaney has videos of all these incidents. He names the defendants in their official and individual capacities.

Finally, in his seventh claim, Plaintiff alleges that he has written at least nine letters to Chief Deputy Jay Cantrell and at least ten letters to Corporal Tom Mulvaney since January 15, 2022, detailing Plaintiff's concerns regarding the operation of the facility and various alleged constitutional violations, including those outlined in this action. *Id.* at p. 21. Plaintiff alleges that these defendants have "displayed a callous deliberate indifference to [his] complaints and to the rights of the detainees in general." *Id.* Plaintiff claims that their failure to train and supervise has "caused and continues to cause the violation of [his] rights and of every other detainee of the detention center." *Id.*

Plaintiff is requesting specific monetary damages from each defendant and from Washington County.   Plaintiff requests that a third-party detainee rights advocate be installed at the detention center and that Chief Deputy (now Sheriff) Jay Cantrell and Tom Mulvaney issue public apologies.   *Id.* at p. 10.

## LEGAL STANDARD

Under the PLRA, the Court is obliged to screen the case prior to service of process being issued.   The Court must dismiss a complaint, or any portion of it, if it contains claims that: (1) are frivolous, malicious, or fail to state a claim upon which relief may be granted; or (2) seek monetary relief from a defendant who is immune from such relief.   28 U.S.C. § 1915A(b). A claim is frivolous if "it lacks an arguable basis either in law or fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).   A claim fails to state a claim upon which relief may be granted if it does not allege "enough facts to state a claim to relief that is plausible on its face."   *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).

"In evaluating whether a pro se plaintiff has asserted sufficient facts to state a claim, we hold 'a pro se complaint, however inartfully pleaded . . . to less stringent standards than formal pleadings drafted by lawyers.'" *Jackson v. Nixon,* 747 F.3d 537, 541 (8th Cir. 2014) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). The rule of liberal construction, however, does not excuse a pro se plaintiff from alleging sufficient facts to support his claims. *Stone v. Henry*, 364 F.3d 912, 914 (8th Cir. 2004).   Thus, even though a plaintiff is proceeding pro se, the district court will not "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint." *Id.* at 915.

## ANALYSIS

To state a claim under 42 U.S.C. § 1983, "a plaintiff must allege a violation of a constitutional right committed by a person acting under color of state law." *Andrews v. City of West Branch, Iowa*, 454 F.3d 914, 918 (8th Cir. 2006).   Here, Plaintiff enumerates seven causes of action, but, in the Court's view, each cause of action contains additional claims. The Court views these claims as generally alleging violations of the (1) First Amendment and (2) the Due Process Clause of the Fourteenth Amendment and each is addressed in turn below.

### A. First Amendment

An inmate "retain[s] those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Yang v. Missouri Dept. of Corr.*, 833 F.3d 890, 894 (8th Cir. 2016).   These rights include "the right to communicate with persons outside the prison walls . . . ." *Id.* Plaintiff's First Amendment claims concern: (1) mail delivery; (2) access to writing instruments and writing paper; and (3) retaliation.

### 1.  *Mail Delivery*

Turning first to Plaintiff's concerns regarding his mail, "[i]nmates have a First Amendment right of free speech to send and receive the mail." *Hudson v. Palmer*, 468 U.S. 517, 547 (1984). The Supreme Court has held that "restrictions on outgoing inmate mail must be generally necessary to protect a legitimate government interest." *Berdella v. Delo*, 972 F.2d 204, 209 (8th Cir. 1992) (citing *Procunier v. Martinez*, 416 U.S. 396, 414 (1974), *overruled in part by Thornburgh v. Abbott*, 490 U.S. 401, 411-14 (1989) (limiting *Procunier* to outgoing mail)). Plaintiff claims his First Amendment right was violated when (1) Cpl. Cradduck refused to deliver a "properly addressed and stamped envelope" addressed to Cpl. Tom Mulvaney, (ECF No. 1 at p. 5); (2) Sgt. Allen, Dfc. Granados, and Sgt. Pineda refused to mail USPS-issued pre-stamped, properly addressed envelopes to JaNan Arnold, the attorney for the Washington County Sheriff's Department on December 7, 8, and 9, 2022, respectively (ECF No. 1 at p. 6); (3) Cpl. Mulvaney refused to stamp three pieces of "legal mail," (ECF No. 1 at p. 7); and (4) Deputy Eoff opened his mail to this District during a search of his cell outside of his presence and when he returned, the contents of the envelope were missing. (ECF No. 1 at p. 16).

### a.  **Claim Against Cpl. Cradduck**

Taking these claims in order, Plaintiff's allegation that Cpl. Cradduck refused to mail a properly addressed stamped envelope to Cpl. Tom Mulvaney fails as a matter of law. In *Finney v. Arkansas Bd. of Corr.*, 505 F.2d 194 (8th Cir. 1974), the United States Court of Appeals for the Eighth Circuit found that "[i]f a person does not wish to receive prisoner mail, he may so notify the prison, and then prison officials may be justified in refusing to send further mail." *Id.* at 211. The Eighth Circuit applied this principle in *Berdella*, upholding a prison policy honoring a person's

request not to receive mail from an inmate. *Berdella*, 972 F.2d at 209. Here, as in *Berdella*, the record shows that Cpl. Mulvaney has indicated that he does not want to receive mail from Plaintiff. (ECF No. 1 at p. 5). Accordingly, Plaintiff's claim that Cpl. Cradduck violated his First Amendment right by honoring this request should be dismissed.

### b.   Claims Against Sgt. Allen, Dfc. Granados, and Sgt. Pineda

Plaintiff claims that Sgt. Allen, Dfc. Granados, and Sgt. Pineda refused to mail USPS-issued, pre-stamped properly addressed envelopes to JaNan Arnold, the attorney for the Washington County Sheriff's Department on three days in December – December 8-9, 2022.   As pled, this Court sees no overarching governmental interest that would permit WCDC staff to prevent an inmate from sending mail to opposing counsel. Thus, at this stage of the proceeding, this Court finds that Plaintiff has pled a plausible First Amendment claim against Sgt. Allen, Dfc. Granados, and Sgt. Pineda for refusing to deliver his mail.

This claim additionally and importantly implicates Plaintiff's constitutional right to access-to-the-courts. *See White v. Kautzky*, 494 F.3d 677, 679 (8th Cir. 2007) (The United States' Constitution guarantees prisoners a right of access to the courts).   This right is well-established, and allegations of interference are of grave concern to the undersigned.

"To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (citing *White v. Kautzky*, 494 F.3d 677, 680 (8th Cir. 2007)).   To prove actual injury, moreover, "a prisoner must demonstrate that a nonfrivolous legal

claim had been frustrated or was being impeded." *Id.* (quoting *Lewis v. Casey*, 518 U.S. 343, 353 (1996)).   Here, Plaintiff has not established that he suffered any injury because Sgt. Allen, Dfc. Granados, and Sgt. Pineda did not mail his letters to opposing counsel, Ms. Thomas.   While the Court finds Plaintiff has pled sufficient facts to establish a cognizable First Amendment claim against these defendants in their individual capacities (and this claim will survive review), this Court finds Plaintiff has not established a plausible "access-to-the-courts" claim.

### c.   Claim Against Cpl. Mulvaney

Turning now to Plaintiff's claim that Cpl. Mulvaney refused to stamp three pieces of legal mail, the Eighth Circuit has considered access to postage in terms of an "access-to-the-courts" claim. *See Blaise v. Fenn*, 48 F.3d 337 (8th Cir. 1995); *Hershberger v. Scaletta*, 33 F.3d 955 (8th Cir. 1994).   This Court will follow suit.

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996). "To protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared." *Id.* However, "[i]nmates do not have a right . . . to unlimited stamp allowances for legal mail." *Id.*; *see also Blaise*, 48 F.3d at 339 (meaningful access to the courts does not require inmates to be provided with unlimited postage).   Rather, "the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts." *Id.* To establish a claim that a policy violates that right, therefore, "inmates must assert that they suffered an actual injury to pending or contemplated legal claims." *Id.*

Here, Plaintiff claims that the WCDC stamps two letters per week for inmates considered

11

"indigent." (ECF No. 1 at p. 7).  Plaintiff does not appear to challenge the fact that he is not considered "indigent" as the WCDC has defined that term. *Id.* Instead, Plaintiff claims that Cpl. Mulvaney should have stamped his legal mail because the stamps he had purchased through the commissary had not yet arrived. *Id.*  As noted above, Plaintiff has failed to state a plausible "access-to-the-courts" claim because he does not allege that Cpl. Mulvaney's refusal to stamp his legal mail led him to suffer any injury. *See Hartsfield*, 511 F.3d at 831 (To establish an "access to the courts claim" plaintiff must show actual injury, which requires demonstrating that "a nonfrivolous legal claim had been frustrated or was being impeded").  Plaintiff alleges he was "trying to file a 1983" claim, (ECF No. 1 at p. 7); however, there is nothing to suggest that a delay in acquiring postage to mail this 1983 claim resulted in the claim being denied or otherwise dismissed as untimely.   Accordingly, Plaintiff's claim that Cpl. Mulvaney refused to stamp his mail should be dismissed.

### d.  Claims Against Deputy Eoff

While the Court views these allegations – if true – as unacceptable behavior, Plaintiff's allegations against Deputy Eoff for opening his legal mail outside his presence, tearing pages of the counterclaim he had composed in his domestic relations case, and confiscating his letter to the District Court do not establish a plausible section 1983 claim.

First, regarding Plaintiff's claim that Deputy Eoff opened his legal mail outside his presence, in *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Supreme Court concluded that prison officials may open and inspect a prisoner's mail outside his presence unless the mail is privileged legal mail. *Id.* at 576-77. Thus, the threshold question for the Court is whether correspondence to the court constitutes "privileged legal mail," and this Court finds it does not. Privileged legal mail

is defined as "mail to or from and inmate's attorney and identified as such." *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997). "Mail to and from a court or opposing counsel does not fall under this narrow definition of privileged mail and, therefore, may be opened outside of the inmate's presence." *Barron v. Jones*, No. 3:20-CV-00311-DPM-PSH, 2020 WL 6200187 at * 2 (E.D. Ark. Oct. 22, 2020), *report and recommendation adopted by* 2020 WL 6750353 at *1 (E.D. Ark. Nov. 17, 2020) (citing *Burgess v. Dormire*, No. 05-4111-CV-S-SOW, 2006 WL 1382317, at *3 (W.D. Mo. May 17, 2006)), *see also Moore v. Rowley*, 126 F. App'x 759, 760 (8th Cir. 2005) (per curiam) (concluding that prisoner had no constitutional right to have his bankruptcy petition mailed without first being inspected).   For these reasons, Plaintiff does not establish a constitutional violation against Deputy Eoff for opening Plaintiff's mail addressed to the court outside of Plaintiff's presence, and this claim should be dismissed.

Second, Plaintiff's claims that Deputy Eoff tore documents related to his domestic relations case and purportedly confiscated his letter to the Court similarly fail to establish an "access-to-the-courts" claim because Plaintiff does not allege that he suffered any injury from this conduct.  *See, e.g.*, *Hartsfield*, 511 F.3d at 831. To the extent that Plaintiff alleges this conduct constitutes a deprivation of property in violation of his due process rights, such a claim is addressed below.

### 2.  *WCDC Pencil Policy and Access to Writing Paper*

The Court considers Plaintiff's claims about being denied a pencil and writing paper both in terms of his constitutional right to "access-to-the-courts," and his First Amendment right to free speech.

In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court held that meaningful access to the courts means that "indigent inmates must be provided at state expense with paper and pen

13

to draft legal documents . . . ." *Id.* at 824-25.   Here, it appears that WCDC has not classified Plaintiff as "indigent," and Plaintiff does not appear to be challenging this finding.   Rather, Plaintiff claims that non-indigent WCDC inmates like himself cannot acquire pencils at the WCDC because they are simply not available for purchase through the commissary. (ECF No. 1 at pp. 13-15). Further, Plaintiff claims that Cpl. Corely and Dfc. Eoff deprived him of writing paper that he ordered from commissary and was intended for him. (ECF No. 1 at p. 9).

Again, "[t]o assert a successful claim for denial of meaningful access to the courts . . . an inmate must demonstrate that he suffered prejudice." *Berdella*, 972 F.2d at 210.   However, "a systemic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." *Hershberger v. Scaletta*, 33 F.3d 955, 956 (8th Cir. 1994). Plaintiff establishes, at most, that the WCDC's pencil policy prevents non-indigent detainees like himself from acquiring pencils without having to engage in otherwise prohibited activity because no pencils are available through the commissary.   Because Plaintiff does not claim that there are no other writing instruments available for purchase through the commissary, Plaintiff has not established that WCDC's pencil policy constitutes a "systemic denial of inmates' constitutional rights" to access to the courts. *See Blaise*, 48 F.3d at 340 (listing cases).   Further, Plaintiff does not establish that the pencil policy and/or being deprived of writing paper from April 8, 2022, to May 7, 2022, prejudiced Plaintiff in the litigation of any of his cases.   Accordingly, Plaintiff's "access-to-the-courts" claim, premised upon the pencil policy and delayed provision of paper, fails.

The First Amendment, however, requires the Court to consider these claims using a different analysis. "Any form of involuntary confinement, whether incarceration or involuntary

commitment, may necessitate restrictions on the right to free speech." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1038-39 (8th Cir. 2012). "When a prison regulation impinges on an inmate's ability to communicate with others, it is valid if it is 'reasonably related to legitimate penological objectives." *Yang v. Missouri Dept. of Corr.*, 833 F.3d 890, 894 (8th Cir. 2016). In making this determination, courts consider (1) whether the regulation is rationally connected to a legitimate and neutral governmental interest; (2) whether the inmate has an alternative means of exercising the constitutional right; (3) the impact accommodating the inmate's asserted right would have on prison staff, prisoners, and resources, and (4) whether ready alternatives to the regulation exist." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)).

According to Plaintiff, he is not eligible to receive a pencil at no cost from the WCDC because he is not indigent, and he is unable to purchase a pencil from commissary because they are not offered. Although he acquired pencils by bartering with other inmates, Plaintiff did so in violation of WCDC policy, putting himself at risk of disciplinary action.   Plaintiff claims he uses a pencil to "write letters," "file court motions," "make charts, graphs, and spreadsheets," and "to take legal notes." (ECF No. 1 at p. 14).   Plaintiff's use of the pencil, therefore, is more encompassing than litigating his cases.   Taken as true, WCDC's pencil policy operates as a bar for non-indigent WCDC inmates such as Plaintiff to communicate with others unless the inmates risk violating WCDC policies by acquiring pencils from others. On this record, the Court finds that WCDC pencil policy has the effect of chilling speech, and the Court does not view this policy as reasonably related to any legitimate penological objectives. Accordingly, this Court recommends that this claim proceed against Dfc. Schmidt, Deputy Redmond, Cpl. Rollins, Dfc. Montano, Dfc. Drumright, Dfc. Dersam, Cpl. Tate, and Sgt. Foster in their individual capacities.

Plaintiff further alleges that Cpt. Ake is the author of the WCDC pencil policy.   The Court finds that Plaintiff has alleged sufficient facts showing that Cpt. Ake is directly involved in the pencil policy at issue to establish a plausible claim against Cpt. Ake in his individual capacity. *See Messimer v. Lockhart*, 702 F.2d 729, 732 (8th Cir. 1983) (allegation against defendant who was in charge of policy decisions at the prison sufficient to state a claim against the defendant). To the extent that Plaintiff is alleging that Cpl. Mulvaney failed to adequately supervise and train WCDC staff, such a claim is addressed below, along with Plaintiff's official capacity claims.

Plaintiff similarly claims he was deprived writing paper from April 8, 2022, to May 7, 2022. (ECF No. 1 at p. 8).   Plaintiff 's Complaint identifies multiple reasons why he needs paper; for example, Plaintiff keeps a journal logging when he requested (and was denied) a pencil, and by whom; and he writes letters, takes legal notes, and prepares spreadsheets and charts. (ECF No. 1 at pp. 13-14). Although he was ultimately given writing paper on May 8, 2022, the Court finds that Plaintiff established a plausible claim that depriving him of paper during this period chilled his speech, and the Court cannot say this deprivation was reasonably related to any legitimate penological interest. Accordingly, this Court recommends that Plaintiff's claims against Corporal Corely and Dfc. Eoff in their individual capacities should proceed.

### 3. *Retaliation Claims*

Plaintiff identifies several incidents where the defendants ordered him to stop talking. (ECF No. 1 at pp. 18-20).   As the Court understands his Complaint, Plaintiff is attempting to raise a First Amendment retaliation claim under 42 U.S.C. § 1983.

The First Amendment "prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To

establish a First Amendment retaliation claim, a plaintiff must prove: "(1) he was engaged in a protected activity; (2) [a defendant] took adverse action against him that would chill a person of ordinary firmness from continuing the activity; and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020). The Court believes that part of Plaintiff's retaliation claims should be dismissed but one should survive.

Assuming without deciding, the Court finds Plaintiff was engaged in protected activity when he (1) complained to deputies about the leaky toilet in his cell; (2) educated the deputies on his thoughts regarding a brewing race riot; (3) discussed how he was preparing to file a 42 U.S.C. § 1983 action over the facility's COVID-19 response; and (4) discussed how WCDC personnel were violating detainee's constitutional rights by filling out legal paperwork on behalf of detainees.

Although unprofessional, the Court finds that officers swearing at, or using derogatory language towards, Plaintiff does not rise to the level of "adverse action" for the purposes of a First Amendment retaliation claim. *See, e.g.*, *Taylor v. Bailey*, 494 F. App'x 674, 675 (8th Cir. 2012) (per curiam) (plaintiff established First Amendment retaliation claim where defendant "had [plaintiff] placed in administrative segregation on a trumped-up allegation (for which he was never formally charged or disciplined)"); *Houston Comm. College System v. Wilson*, -- U.S. --, 142 S. Ct. 1253, 1261 (2002) ("[N]o one would think that a mere frown from a supervisor constitutes a sufficiently adverse action to give rise to an actionable First Amendment claim."). This conclusion is further buttressed by the fact that Plaintiff, in response to the deputies' actions, did not cease his complaining or silence his speech.  In determining whether the adverse action would "chill a person of ordinary firmness from continuing the activity," courts ask: "[w]hat would a person of

'ordinary firmness' have done in reaction to the [adverse action]?" *Gonzalez*, 971 F.3d at 745 (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003)).  Although the test is an objective one, courts consider the plaintiff's actions in response to the alleged retaliation "as evidence of what a person of ordinary firmness would have done." *Gonzalez*, 971 F.3d at 745 (citing *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002)).   The answer here is provided by Plaintiff's Complaint – he alleges he continued to speak out about what he perceived to be inadequacies in the operation of the detention facility.   While Plaintiff's objections may have not occurred during the specific times he was being confronted by WCDC staff, these confrontations did not silence Plaintiff.   Because defendants' alleged responses to Plaintiff's speech did not chill his further speech, the Court recommends that a portion of Plaintiff's First Amendment retaliation claims be dismissed.

In the Court's view, however, Plaintiff's First Amendment retaliation claim against Cpl. Rollins presents a closer question because Rollins' "adverse action" allegedly included not merely the use of derogatory or profane language, but threats of violence – telling Plaintiff he needs to "shut the hell up or he'd shut [him] up" – and physical conduct –"punch[ing] the window right in [Plaintiff's] face." (ECF No. 1 at p. 19).   Taken as true, this Court finds that Plaintiff has established a plausible First Amendment retaliation claim against Cpl. Rollins in his individual capacity because such conduct could "chill a person of ordinary firmness from continuing the activity." *Gonzalez, supra.*

### B.  Due Process Clause

#### 1.  *Excessive Force*

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from

"the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979)). To establish such a claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). Courts, however, cannot apply the "objectively unreasonable" standard mechanically. *Id.* at 397. "Rather, objective reasonableness turns on the facts and circumstances of each particular case." *Id.* (quoting *Graham*, 490 U.S. at 396). A court must adopt "the perspective of a reasonable officer on the scene" and base its analysis on "what the officer knew at the time," without "the 20/20 vision of hindsight." *Id.*

Here, Plaintiff alleges three incidents of use of force:   On March 29, 2022, Dfc. Hunter Eoff "shoulder checked" him, striking Plaintiff in the back with his shoulder and elbow while he was exiting the building, (ECF No. 1 at p. 16); on March 31, 2022, Cpl. L. Cradduck "struck [him] in the sternum with his fist," (ECF No. 1 at p. 6); and on April 23, 2022, Dfc. Eoff stepped on the back of his bare ankle and heel with his steel-toed combat boot as he and Dfc. Vasilopolous were escorting Plaintiff through the facility, (ECF No. 1 at p. 16).   Recognizing that the Court must "accept[] as true all of the factual allegations contained in the complaint and afford[] the plaintiff all reasonable inferences that can be drawn from those allegations," *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011), this Court finds that Plaintiff has stated a plausible claim that Dfc. Eoff's use of force against him on March 29, 2022, and again on April 23, 2022, along with Cpl. Cradduck's use of force against him on March 31, 2022, was not "objectively reasonable." Accordingly, this Court recommends that the excessive force claims against Dfc. Eoff and Cpl. Cradduck in their individual capacities proceed.

19

### 2. *Verbal Threats*

In addition to use of force, Plaintiff further claims defendants verbally threatened and insulted him. "Generally, mere verbal threats made by a state-actor do not constitute a § 1983 claim." *Hopson v. Fredericksen*, 961 F.2d 1374, 1378 (8th Cir. 1992). Courts have recognized an exception to this general rule in circumstances where the threat amounts to a "wanton act of cruelty" such that the inmate is in fear of "instant and unexpected death at the whim of his allegedly bigoted custodians." *Id.* (quoting *Burton v. Livingston*, 791 F.2d 97, 100 (8th Cir. 1986)).

Plaintiff's claims that (1) Cpl. Nunziato screamed at him to "shut the fuck up and get back in the fucking house;" (2) Cpl. Cradduck became angry and to him to "shut up; and (3) an unidentified corporal became furious with him and told him to "shut the fuck up," simply do not rise to the level of a constitutional violation. (ECF No. 1 at p. 18). Plaintiff does not allege he suffered any injury as a result of these insults, that the insults were accompanied by some physical gesture, or that he even felt threatened with any harm. *See Hopson*, 961 F.2d at 1378 (Plaintiff's allegation that officer uttered a racial slur and then threatened to "knock [his] remaining teeth out of his mouth" if he remained silent did not constitute a constitutional violation). Thus, these claims should fail.

Plaintiff's allegation that Cpl. Rollins "punched the [cell] window right in front of [his] face and told [him] to shut the hell up or he'd shut [him] up" once again presents a closer question. (ECF No. 1 at p. 19). Precedent dictates, however, that this Court recommend that this claim be dismissed because Plaintiff does not allege he suffered any injury. *See Hopson*, 961 F.2d at 1379 (considering the absence of any physical harm as a factor in concluding no constitutional violation occurred). Plaintiff does not allege that Cpl. Rollins threatened to kill him or that he brandished

a weapon, and because the conduct alleged does not constitute a "wanton act of cruelty," Plaintiff's claim against Cpl. Rollins should fail. To the extent that Plaintiff contends that the verbal insults and threats constitute First Amendment retaliation claim, the Court addressed this claim above.

### 3.   *Deprivation of Property*

Plaintiff claims that after Dfc. Eoff searched his cell, his letter to the Court was missing and pages had been torn from the pleading he was composing in his domestic relations case.   (ECF No. 16). The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Courts have interpreted procedural due process considerations as imposing "constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Walters v. Wolf*, 660 F.3d 307, 311 (8th Cir. 2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).   Assuming without deciding that Plaintiff has a recognized property interest in his letter to the Court and his legal pleading, the question then becomes what process Plaintiff is owed for loss of that property.

In answering this question, the Supreme Court has generally been clear that "the Constitution requires some kind of hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). "In some circumstances, however, the Court has held that a statutory provision for a post deprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Id.* at 128. The Supreme Court has identified that such circumstances may include "cases where the predicate deprivation is, or is akin to, a tortious loss of a prisoner's property resulting from a random unauthorized act by a state

employee – versus some established state procedure." *Walters*, 660 F.3d at 312 (quoting *Parratt v. Taylor*, 451 U.S. 527, 541 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)). "The loss of property . . . is in almost all cases beyond the control of the [government], in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation." *Id.*

Plaintiff's circumstances are reflective of this dilemma.   Assuming Plaintiff has a property interest in his letter and legal pleading, and assuming Dfc. Eoff deprived him of that property interest, a post-deprivation hearing is the most process Plaintiff is due. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (intentional deprivation of property does not violate due process when meaningful post-deprivation remedy is available).   Arkansas law provides such a post-deprivation remedy through a legal action for conversion.  *See e.g., Elliott v. Hurst*, 817 S.W.2d 877, 880 (Ark. 1991) (cause of action for conversion lies where distinct act of dominion is exerted over property in denial of owner's right).   Accordingly, Plaintiff's claim concerning the loss of his letter and pleading does not establish a cognizable § 1983 claim.   The Court therefore recommends that this claim be dismissed.

### C. Failure to Train and Supervise

Plaintiff alleges that Chief Deputy (now Sheriff) Jay Cantrell and Cpl. Tom Mulvaney are liable in their individual capacities for failure to supervise and train. (ECF No. 1 at pp. 21-22).

For a supervisor to be liable under § 1983 on a theory of "failure to supervise or failure to train," the plaintiff must show that the supervisor's "failure to supervise and train amounts to deliberate indifference to the rights of the persons with whom [the tortfeasor] came into contact." *Doe v. Fort Zumwalt R-II School Dist.*, 920 F.3d 1184, 1189 (8th Cir. 2019) (quoting *City of*

*Canton v. Harris*, 489 U.S. 378, 388 (1989).   To establish that Chief Deputy Jay Cantrell and Cpl. Tom Mulvaney violated Plaintiff's constitutional rights on a failure to supervise theory, Plaintiff must show that they: "(1) Received notice of a pattern of unconstitutional acts committed by subordinates; (2) demonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) failed to take sufficient remedial action; and (4) that such failure proximately caused injury to [Plaintiff]." *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010).   Additionally, the failure to train must amount to "deliberate indifference to the rights of persons with whom police came into contact," and Plaintiff must establish "that the alleged failure to train 'actually caused' the constitutional deprivation." *Id.*

Deliberate indifference is a "stringent standard of fault." *Doe v. Fort Zumwalt R-II School Dist.*, 920 F.3d 1184, 1189 (8th Cir. 2019) (quoting *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). "A pattern of similar constitutional violations . . . is 'ordinarily necessary' to demonstrate deliberate indifference . . . ." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Alternatively, a plaintiff may show that "the need for more supervision or training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers [ ] can reasonably be said to have been deliberately indifferent to the need." *Id.* (quoting *Canton*, 489 U.S. at 389).   In either case, the supervisors' failure to train or supervise must be "the moving force behind the constitutional violation." *Id.*

In support of this claim, Plaintiff alleges he has written at least nine letters to Chief Deputy Jay Cantrell and at least ten letters to Corporal Tom Mulvaney "regarding the litany of civil rights violations" he has endured at the WCDC. (ECF No. 1 at p. 21)   Plaintiff does not detail the contents of the letters, yet when the Court views Plaintiff's Complaint as a whole, he alleges that

Cpl. Mulvaney was aware of Plaintiff's efforts to acquire a pencil, but did not take any action. Taken as true, the Court finds Plaintiff has established a plausible failure to supervise claim against Cpl. Mulvaney in his individual capacity with respect to the WCDC pencil policy.

With respect to the Plaintiff's remaining claims which survive screening – including the defendants' failure to deliver Plaintiff's mail and provide him with paper in violation of his First Amendment right; Dept. Eoff and Cpt. Cradduck's alleged use of excessive force; and the First Amendment retaliation claim against Cpl. Rollins – although Plaintiff may have informed Cpl. Mulvaney and then Chief Deputy Jay Cantrell of these violations, he has not established sufficient facts to plead a plausible claim that their failure to supervise and train *caused* the alleged constitutional violations.

### D.  Capacity Pleading

Plaintiff names the defendants in their official and individual capacities.  An official capacity claim is the equivalent to a claim against the official's employer, or, in this case, Washington County, Arkansas. *See Liebe v. Norton*, 157 F.3d 574, 578-79 (8th Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).  Put another way, an official capacity claim alleges that the governmental entity *itself* caused the constitutional violation at issue. *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006).  To prevail on an official capacity claim, the plaintiff must establish that "the constitutional violation has been committed pursuant to an official custom, policy, or practice." *Granda v. City of St. Louis*, 472 F.3d 565, 568 (8th Cir. 2007).

This Court recommends that five sets of claims proceed past screening: (1) Plaintiff's claims alleging three instances where WCDC staff refused to deliver his mail; (2) Plaintiff's claims alleging that WCDC staff refused to provide Plaintiff with a pencil pursuant to the WCDC "pencil

24

policy"; (3) Plaintiff's claims alleging that WCDC staff deprived him of writing paper for "several weeks;" (4)   Plaintiff's First Amendment retaliation claim against Cpl. Rollins; and (5) Plaintiff's two (2) excessive force claims against Dept. Eoff and one (1) excessive force claim against Cpt. Cradduck.

At this stage, the Court finds Plaintiff has established a plausible official capacity claim regarding the WCDC "pencil policy." The Court recommends that an official capacity claim against Cpt. Ake – the purported author of this seemingly troublesome policy – proceed.   The Court recommends that any official capacity claim related to Plaintiff's remaining claims be dismissed. While Plaintiff alleges that "it is the blanket unofficial policy of the Washington County Sheriff's Department to completely deny, disregard and violate detainee's rights," (ECF No. 1 at p. 8), such allegations are conclusory, and as such, they are not afforded the usual presumption of truth at the pleading stage. *See Twombly*, 550 U.S. at 570. Similarly, despite Plaintiff's suspicions that his mail has been tampered with, (ECF No. 1 at p. 6), Plaintiff's allegations are far too speculative to establish that Washington County policy is the "moving force behind" the alleged constitutional violation. *See Polk County v. Dodson*, 454 U.S. 312, 326 (1981) ("[A] governmental entity is liable under § 1983 only when the entity itself is a "moving force" behind the deprivation.").[2]

## CONCLUSION

For the reasons outlined above, the undersigned recommends that Plaintiff's Complaint

---

[2] Further, the Court finds that Plaintiff has not established that the purported irregularities in his mail amount to a First Amendment violation. *See, e.g.*, *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (Plaintiff must show regular and unjustifiable interference—an isolated incident of mail tampering is usually insufficient to establish a constitutional violation); *Zimmerman v. Tribble*, 226 F.3d568, 572 (7th Cir. 2000) (allegations of "sporadic and short term" delays and disruptions are not sufficient to state a First Amendment claim).

(ECF No. 1) be **DISMISSED WITHOUT PREJUDICE, <u>SAVE AND EXCEPT</u> for the FOLLOWING CLAIMS WHICH SURVIVE at this stage of the proceeding and should be SERVED:**

1.  Claims against Sgt. Allen, Dfc. Granados, and Sgt. Pineda in their individual capacities for failure to deliver Plaintiff's mail in violation of the First Amendment right shall proceed.

2.  Claims against Dfc. Schmidt, Deputy Redmond, Cpl. Rollins, Dfc. Montano, Dfc. Drumright, Dfc. Dersam, Dfc. Frye, Cpl. Tate, Dfc. Phipps, and Sgt. Foster in their individual capacities for depriving Plaintiff of a pencil in violation of the First Amendment shall proceed.

3.  Claims against Cpt. Ake in his individual and official capacity for authoring the WCDC pencil policy shall proceed.

4.  Claims against Cpl. Mulvaney in his individual capacity for failure to train and supervise with respect to the WCDC pencil policy shall proceed.

5.  Claims against Cpl. Corley and Dfc. Eoff in their individual capacity for depriving him of writing paper in violation of the First Amendment shall proceed.

6.  Plaintiff's First Amendment retaliation claim against Cpl. Rollins in his individual capacity shall proceed.

7.  Claims against Dpt. Eoff in his individual capacity for use of excessive force on March 29, 2022, and April 23, 2022, shall proceed.

8.  Claims against Cpt. Cradduck in his individual capacity for use of excessive force on March 31, 2022, shall proceed.

**It is further recommended that Defendants Chief Deputy (now SHERIFF) Jay Cantrell, Cpl. D. Nunziato, and Cpl. K. Turner be stricken from this matter.**

## **OBJECTIONS**

The parties have **fourteen (14) days** from receipt of the Report and Recommendation in which to **file written objections** pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 10th day of February 2023.


*Christy Comstock*
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE

27