IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHN WILLIAM SCHARNHORST, III                                          PLAINTIFF

v.                        Civil No. 5:22-CV-05243-TLB-CDC

CAPTAIN NOLAN AKE; SERGEANT CARLOS PINEDA;
SERGEANT JACOB ALLEN; DEPUTY GRANADOS;
DEPUTY H. EOFF; CORPORAL L. CRADDUCK;
CORPORAL D. ROLLINS; DEPUTY M. REDMOND; DEPUTY MONTANO;
DEPUTY DRUMRIGHT; CORPORAL TATE; OFFICER R. PHIPPS;
SERGEANT FOSTER; CORPORAL CORLEY; and
CORPORAL T. MULVANEY                                                    DEFENDANTS

**MAGISTRATE'S REPORT AND RECOMMENDATION**

This is one of seven civil rights actions Plaintiff John William Scharnhorst, III, has filed in this District challenging the constitutionality of various policies of the Washington County Detention Center ("WCDC") and the conduct of several WCDC officials.[1]  Plaintiff, a prisoner,[2] proceeds *pro se* and *in forma pauperis*.  (ECF No. 3).  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this

---

[1] *See Scharnhorst v. Cantrell, et al.*, Case No. 5:22-cv-05138-TLB-CDC (W.D. Ark. July 15, 2022); *Scharnhorst v. Helder et al.*, Case No. 5:22-cv-05167-TLB-CDC (W.D. Ark. Aug. 10, 2022); *Scharnhorst v. Cantrell, et al.*, Case No. 5:22-cv-05176-TLB-CDC (W.D. Ark. Aug. 30, 2022); *Scharnhorst v. Cantrell, et al.*, Case No. 5:22-cv-05218-TLB-CDC (W.D. Ark. Oct. 19, 2022); *Scharnhorst v. Cantrell et al.*, Case No. 5:22-cv-05232-TLB-CDC (W.D. Ark. Nov. 28, 2022); *Scharnhorst v. Cantrell et al.*, Case No. 5:22-cv-05238-TLB-CDC (W.D. Dec. 14, 2022).

[2] At all times relevant to the factual predicate to this action, Plaintiff was a pretrial detainee at the Washington County Detention Center (WCDC).  Publicly accessible state court records show that Plaintiff has since resolved his state court criminal cases. *See, e.g.*, *State of Arkansas v. Scharnhorst*, 72CR-21-1768 (Ark. Cir. Ct. Feb. 15, 2023) (Amend. Sent. Order) (AOC Public Court Connect). He is currently serving a term of imprisonment for those convictions at the Arkansas Division of Correction. *See* Inmate Search, https://apps.ark.org/inmate_info/search.php (last visited July 15, 2024).

1

case to the undersigned for the purpose of making a Report and Recommendation on Defendants'
Motion for Summary Judgment.  (ECF No. 41).  For the reasons outlined below, this Court
recommends that Defendants' Motion for Summary Judgment be granted in large part and denied
only with respect to Plaintiff's claim challenging the constitutionality of the WCDC's "pencil
policy."

**BACKGROUND**

Plaintiff's Complaint identified seven claims against twenty-one defendants.  (ECF No.
1). [3]   Upon the Court's preservice review of Plaintiff's Complaint pursuant to 28 U.S.C.
§ 1915A(a), the undersigned recommended that the following claims proceed:

1. Plaintiff's claims against Defendants Allen, Granados, and Pineda in their individual capacities for failure to deliver Plaintiff's mail in violation of the First Amendment;

2. Plaintiff's claims against Defendants Schmitt, Redmond, Rollins, Montano, Drumright, Dersam, Frye, Tate, Phipps, and Foster in their individual capacities for depriving Plaintiff of a pencil in violation of the First Amendment;

3. Plaintiff's claims against Defendant Ake in his individual and official capacities for authoring the WCDC "pencil policy;"

4. Plaintiff's claims against Defendant Mulvaney in his individual capacity for failing to train or supervise with respect to the WCDC "pencil policy;"

5. Plaintiff's claims against Defendants Corley and Eoff in their individual capacities for depriving him of writing paper in violation of the First Amendment;

6. Plaintiff's First Amendment retaliation claim against Defendant Rollins in his individual capacity;

---

[3] This section is limited to the background of this case that is relevant to the Court's analysis of
the pending Motion for Summary Judgment.  The Court does not endeavor to describe every
docket entry.

7. Plaintiff's claims against Defendant Eoff in his individual capacity for his purported use of excessive force on March 29, 2022, and April 23, 2022; and

8. Plaintiff's claims against Defendant Cradduck in his individual capacity for his purported use of excessive force on March 31, 2022.

(ECF No. 8). The Court further recommended that all other claims be dismissed without prejudice for failure to state a claim upon which relief can be granted pursuant to 28 U.S.C. § 1915A(b)(1) and that Defendants Cantrell, Nunziato, and Turner be terminated as parties to the case. *Id.* There were no objections, and Judge Brooks adopted these recommendations. (ECF No. 11).

After service of the Complaint on the remaining Defendants, Defendants were directed to either file a motion for summary judgment on the issue of whether Plaintiff properly exhausted his administrative remedies before initiating this action in accordance with 42 U.S.C. § 1997e(a) or promptly file a notice informing the Court and parties that they do not intend to pursue such a defense at trial. (ECF No. 14). In response, Defendants filed a Motion for Partial Summary Judgment for Failing to Exhaust Administrative Remedies, arguing that Plaintiff failed to properly exhaust his administrative remedies with respect to his claims against Defendants Schmitt, Dersam, and Frye. (ECF No. 19). After requesting (and receiving) an extension of time to file a response, (ECF Nos. 25-26), on July 10, 2023, Plaintiff responded in opposition to Defendants' Motion for Partial Summary Judgment. (ECF No. 29). Upon review of the parties' submissions, the undersigned recommended that Defendants' motion be granted, and that the claims against Defendants Schmitt, Dersam, and Frye be dismissed without prejudice for Plaintiff's failure to properly exhaust his administrative remedies. (ECF No. 31). Again, there were no objections, and

3

Judge Brooks adopted these recommendations. (ECF No. 34). Plaintiff's claim that he was denied a pencil in violation of the First Amendment (claim 2) was further narrowed as asserted against only Defendants Redmond, Rollins, Montano, Drumright, Tate, Phipps, and Foster in their individual capacities.

On August 28, 2023, an initial scheduling order directed the parties to complete their discovery by December 26, 2023, and ordered Defendants to file a motion for summary judgment by January 25, 2024. (ECF No. 32). On September 11, 2023, Plaintiff filed a Motion to Supplement his Complaint with a purported retaliation claim against a new defendant; Defendants objected. (ECF Nos. 33, 35). Construing Plaintiff's motion as one to amend his Complaint, this Court denied the proposed amendment as futile. (ECF No. 36). On January 24, 2023, Defendants requested and received a 30-day extension to file their motion for summary judgment. (ECF Nos. 38-39). On February 23, 2024, two months after the close of discovery, Plaintiff filed a motion to compel Defendants to disclose an incident report from March 30, 2016, when he was purportedly "brutally beaten by Washington County Deputies for asserting [his] 14th Amendment rights." (ECF No. 40). On February 27, 2024, Defendants filed their Motion for Summary Judgment on the merits, along with a memorandum and statement of facts in support. (ECF Nos. 41-43). The next day, this Court ordered Plaintiff to respond to Defendants' Motion for Summary Judgment by March 20, 2024, and provided instructions on how to respond. (ECF No. 44).

On March 7, 2024, Defendants opposed Plaintiff's Motion to Compel. (ECF No. 46). On March 12, 2024, this Court denied Plaintiff's Motion to Compel, finding no good cause to modify the Court's initial scheduling order or re-open discovery. (ECF No. 47). On March 22, 2024, Plaintiff requested an extension of time to respond to Defendants' Motion for Summary Judgment.

4

(ECF Nos. 48).   This Court granted that request, ordering Plaintiff to respond by April 22, 2024. (ECF No. 49).   While Plaintiff's response was pending and four months after the close of discovery, Plaintiff filed a Motion for Subpoena for the "testimony of Deputy Vasilopulos."   (ECF No. 50).   Defendants opposed Plaintiff's request for a subpoena, arguing Plaintiff's request was untimely and irrelevant.   (ECF No. 51).   On April 10, 2024, this Court denied as untimely Plaintiff's request for a subpoena.   (ECF No. 52).   On April 22, 2024, Plaintiff opposed Defendants' Motion for Summary Judgment, (ECF No. 53), filing both an affidavit, (ECF No. 53-1), and a statement of disputed facts.   (ECF No. 54).   No reply was filed, and Defendants' Motion for Summary Judgment is ready for decision.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Ward v. Olson*, 939 F. Supp. 2d 956, 961 (D. Minn. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).   A fact is material only when its resolution would affect the outcome of a case. *Anderson*, 477 U.S. at 248.

Further, the moving party bears the initial burden of identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001).   In response, the nonmoving party "may not rest upon mere denials or allegations but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002). In considering a summary judgment motion, the court views all the evidence and inferences in the

5

light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

## FACTS

Plaintiff's claims fall into two general categories: (1) First Amendment claims concerning mail delivery (claim one), access to a writing implement (claims two, three, and four), access to paper (claim five), and retaliation (claim six); and (2) excessive force claims against Separate Defendants Eoff (claim seven) and Cradduck (claim eight).

### A. First Amendment Claims

#### *Mail Delivery*

The Washington County Detention Center Policy Manual ("Manual") differentiates between privileged and general correspondence. (ECF No. 43-7, p. 6). Privileged correspondence is defined as "mail between a detainee any of the following: attorney; judges and clerks of Federal, State, and Local Courts; the Sheriff, Jail Administrator, or members of their staff; The President; Vice President, and Attorney General of the United States; Any member of the United States Congress; [and] the Governor, Lieutenant Governor, and Attorney General of any state. Any member of the Legislature." *Id.*   Relevant here, the policy provides that "[o]utgoing mail to any of the above shall not be opened and inspected in any manner, unless reasonable suspicion exists that the letter poses a threat to the security and order of the facility or threat to the recipient." *Id.*

General correspondence, however, "is mail between a detainee and someone other than those [listed] for privileged correspondence." *Id.*, p. 7.   The policy on general correspondence provides that "[d]etainees shall be allowed to send letters to whomever they wish.   Outgoing mail is not opened, inspected, or censored in any manner unless it is believed it contains escape plans or information, and then a report shall be filed with the Jail Administrator." *Id.*

Plaintiff says that he attempted to mail correspondence to JaNan Arnold Thomas, a lawyer for the Washington County Sheriff's Office, but Defendant Allen refused to mail his letter on December 7, 2022; Defendant Granados refused to mail his letter on December 8, 2022; and Defendant Pineda refused to mail his letter on December 9, 2022.   (ECF No. 1, p. 6).

Plaintiff's kiosk submissions[4] offer details about the contents and disposition of those letters.   On December 8, 2022, Plaintiff wrote:

> Please log this as a grievance since I'm maxed out there amd [sic] they're not being answered. My legal mail, which included discovery material I was attempting to send to your lawyer was returned to me this morning by Sowell and Vincent, the envelope was torn open and ruined and the explanation I was given was "This has contraband in it". The envelope and the "contraband were then handed to me and I was told it would not be mailed. You have no legal basis to refuse to allow me to mail EVIDENCE to your lawyer. I want a replacement stamped envelope.

(ECF No. 43-3, p. 38).   On December 12, 2022, Defendant Mulvaney responded:

> We are following policies/ procedures regarding outgoing mail. The only thing aloud [sic] to be sent out in the mail are letters, not dirt, wiring, wire nuts, and whatever you decide to try, or have, sent before in the past. All of these items are to be considered contraband, or just outright trash. I will check into the envelopes. Cpl. Mulvaney

*Id.*   Plaintiff replied that same day, writing, in pertinent part:

> You are not complying with established case law regarding this issue. You are abusing your authority beyond leal [sic] bounds necessary to ensure the safety and security of the jail and are exercising an exaggerated response to any legitimate interest, infringing on my 1st amendment rights by refusing to send my outgoing mail. 12/9, the only thing in the envelope I tried to send to your lawyer was a copy of the Motion for Restraining Order that I also filed with the court and a few notes explaining that you were violating my rights some cited case law and a note that said "have a nice day", with a smilie [sic] face. All of this is documented on body

---

[4] Both Plaintiff and Defendants submitted copies of Plaintiff's kiosk submissions for this Court to consider in analyzing Defendants' Motion for Summary Judgment.   *See generally* (ECF No. 43-3); (ECF No. 54, p. 19, 21-36).   While there may be some overlap between the kiosk submissions provided by the parties, the Court considers both sets as the closed universe of Plaintiff's kiosk submissions for the purposes of Defendants' Motion for Summary Judgment.

cam by Bilbrey and Phipps. Please return my COIAA as I am waiting on it in order to file this 1983 against you, Pineda, Granados, Velasco, Beck Cradduck and others for the ongoing documented obstruction of my mail which I have documented since February.

*Id.,* p. 39.    After Defendant Mulvaney requested more information in response to Plaintiff's

reply, Plaintiff submitted the following:

> As I have ALREADY PREVIOUSLY REPORTED AND ASKED YOU TO SAVE VIDEO OF: 12/9/22.   Approximately 12:55 PM Bilbrey and Phipps returned my mail which contained a motion for Temporary Restraining Order and hand written notes on state issue yellow paper. According to them Pineda instructed them to return it, he made the decision to refuse my legal mail to your lawyer JA Thomas. Bilbrey and Phipps both recorded the incident with their body cams ad Phipps came to my door a few minutes later and recorded a second conversation with me where I showed him the paperwork and went over each piece in detail.

*Id.*, p. 40.    On December 7, 2022, Plaintiff wrote about what appears to be a different piece

of mail:

> Mulvaney, please save video from A-1, today 12/7/22 at the following approximate times showing the following events: 10:13-10:16AM I collect a sample of the sewage out of the expansion joints in the floor, sweep it onto yellow paper with a comb, and place the paper and comb into an envelope addressed to JA Thomas, your attorney. 10:30AM Stout comes in and takes the envelope.

(ECF No. 43-3, p. 41).   On December 9, 2022, Defendant Mulvaney responded, writing:

> Video has been saved, although ... Staff is not to be mailing yours or any detainee mail that contains contraband, which is what you describe here. Just like the items you had mailed in previous mail, like wiring, wire nuts, screws ... etc. You may consider this evidence, but it will not be mailed out to anyone. If the officers are doing there job correctly that piece of mail will be opened either by the detainee, or by the officer in front of said detainee, and the contraband will be removed. The officer will then provide a new envelope and ensure there is no contraband inside and mailed out at that time. Also, I have not "refused" you copies of anything. I am still looking into that issue. Cpl. Mulvaney

(ECF No. 43-3, p. 42).

8

On December 9, 2022, Plaintiff also requested the name of the detention officer who refused to mail his December 7, 2022, correspondence to Ms. Thomas.   (ECF No. 43-3, p. 42). In that request, Plaintiff said that Defendant Granados told him that he (Defendant Granados) was the one who decided not to mail Plaintiff's December 8, 2022, correspondence to Ms. Thomas. *Id.*  Defendant Mulvaney responded that same day, in pertinent part:

> As for anyone "refusing" to send your mail out that was given to Stout. I was not aware that it was not sent out . . . was it returned? I am the person who mentioned to supervisors that we do not mail letters with "contraband" in them, whether legal or personal. . ..

(ECF No. 43-3, p. 43).

### *Plaintiff's Requests for a Pencil and WCDC's Pencil Policy*

Defendants did not submit any "official" written policy on the distribution of pencils or writing implements to non-indigent detainees. [5]   Defendant Mulvaney is a corporal in the Washington County Sheriff's Office ("WCSO").   (ECF No. 43-1, p. 1).   He is the custodian of records for the WCSO, is familiar with the policies and procedures of the jail, and functions as the investigator and grievance officer at the WCDC.   *Id.*   Defendant Mulvaney does not supervise WCDC employees, he is not authorized to "warn, counsel, discipline, or terminate any employee," and while he is "involved in some portions of the jail basic training provided to new detention officers," he is "not involved in any one-on-one training within the various departments of the detention center."   *Id.*, p. 2.   According to Defendant Mulvaney, "indigent supplies are distributed weekly as a part of the regular operations of the housing units.   The supplies include

---

[5] Defendant Mulvaney's affidavit suggests that Defendants included the Washington County Detention Center Detainee Handbook along with the Washington County Detention Center Policies and Procedures Manual ("the Manual") as an exhibit in support of their Motion for Summary Judgment.   (ECF No. 43-1, p. 3).   But no such exhibit appears in the summary judgment record.   *See generally* (ECF No. 43).

hygiene items such as a toothbrush, toothpaste, and soap, as well as correspondence items such as a small pencil, several pieces of paper and two stamped envelopes." *Id.*, p. 5. "Non-indigent inmates can often exchange dull pencils at the time indigent supplies are passed out because the pod deputies have the pencils out." *Id.* Further, "[a]ny inmate who is not deemed indigent must purchase supplies from the commissary." *Id.* "In February of 2022, colored pencils were available for purchase on the commissary. At the time, paper was also available for purchase." *Id.* Plaintiff was not identified as an "indigent" WCDC inmate. *Id.*

At the time of the events giving rise to Plaintiff's claims, Defendant Ake was a lieutenant in the WCDC.[6] (ECF No. 43-8, p. 1). As a lieutenant, he "was neither authorized nor tasked with policy decisions or development. [He] did not author or establish the policy or practices regarding the distribution of pencils or paper to detainees in February of 2022." *Id.*, pp. 1-2. Defendant Ake "is not aware of any policy or practice of the WCDC that would have led to or justified a complete denial of access to pencils or paper to any inmate, indigent or not." *Id.*, p. 2. According to Defendant Ake, "[t]he WCDC provides and allows the use of small, pre-sharpened, 'golf' pencils by inmates in the detention center. Pencils are considered necessary and must be provided in the jail." *Id.*

Defendant Ake explains that "[d]etention [o]fficers are encouraged to freely exchange pencils for inmates when they can. . .. Floor/pod deputies are allowed to provide a pencil upon request and should do so when their duties allow. Like other supplies, pencils should be accepted for exchange (i.e., the inmate should give the dull pencil to the deputy in exchange for the new pencil)." *Id.*, p. 3. Further, "[l]imited access to sharp objects also furthers the County's interest

_____

[6] Defendant Ake is currently the Captain of the WCDC. (ECF No. 43-8, p. 1).

in security of the facility and the inmates and staff therein.   In keeping with this limitation, pencil sharpeners are carried by some pod deputies but are generally not allowed to be kept by inmates in the housing units."   *Id.*, p. 4.   But "[t]ransport deputies, who may be in the housing units handling court appearances or inmate zoom meetings, are not tasked with responding to inmate requests for items such as pencils."   *Id.*, p. 5.

According to Defendant Ake, "[i]nmates who are not indigent can usually exchange pencils at the same time [as indigent inmates who receive indigent supplies] because the pod deputies have a supply available.   Inmates who are not considered indigent can purchase pencils, paper, and stamped envelopes from commissary."   *Id.*, p. 4.   Defendant Ake says that "[a]fter this issue was raised in February 2022, small pencils were made available for purchase on the commissary that same month.   The small pencils remain available for purchase from commissary at the time of this affidavit."   *Id.*, p. 5.

On November 18, 2021, Plaintiff was booked into the Washington County Detention Center ("WCDC") on several pending felonies.   (ECF. 43-2).   On December 9, 2021, Plaintiff submitted a request on the WCDC kiosk system for a pencil.   (ECF No. 43-3).   In response, Cpl. Tabetha Wallace told him to "ask a floor officer."   *Id.*   On February 3, 2022, Plaintiff again requested a pencil and was told to "check with floor officer."   *Id.*, p. 10.   Plaintiff also requested a pencil on February 4, 2022, and Sgt. Will Foster responded, "sure." *Id.*, p. 11.   On February 4, 2022, Plaintiff wrote the following on the kiosk:

> I have asked for a pencil on the kiosk and was told to request one from a floor officer. I asked Tate 6 times last night and Phipps twice today. I cannot buy a pencil on commissary. I am a pro-se defendant and require a writing impliment [sic] and am being denied access to one intentionally in order to inhibit my ability in both defending myself against Tim Helder's criminal accusations and in pursung [sic] my 1983 civil rights violation case against Tim Helder and numerous deputies.

11

Since there is no pencil sharpener and I require a lot of writing I will need at least one pencil every single day. Please make arrangements for a floor guard to deliver a new pencil to me daily as a regular routine, my attempts to get them from the guards every day consistently has been a complete failure as the guards have not only no incentive to provide me with one, but are actually incentivized NOT TO, due to the fact that many of them are guilty of violating my rights and have no intention of providng [sic] me the means to pursue claims against them. I need a permanent solution to this problem which I have been addressing to the floor guards and tower supervisors with extremely poor success for months now. I am tired of struggling, begging and being forced to trade away my food to other detainees in order to meet these needs.

(ECF No. 43-3, p. 12).

In response, Sgt. Will Foster wrote, "[o]ne will be given." *Id.* On February 5, 2022, Plaintiff again requested a pencil. *Id.*, p. 3. On February 6, 2022, Plaintiff requested that pencils be added to the commissary. *Id.*, p. 2. Daniel Giertz responded saying that only colored pencils are available on the commissary. *Id.* On February 6, 2022,[7] Plaintiff submitted the following:

Mulvaney, please save the video from B-Pod this morning at 6:49 AM showing me getting my breakfast and then immediately trading away my oatmeal for a pencil. I have made numerous requests for a pencil on the kiosk and I have asked Phipps, Taylor, Tate and Ochieng for a pencil every time they have come into the barracks for several days in a row now. During that time I have received on pencil from Phipps and when it went dull after a short time I asked him if he could sharpen it for me. He said that there is no sharpener available but that he would trade it out for me. I gave him the dull pencil and he never brought another pencil, despite me reminding him several times. I am intentionally being prevented from being able to take legal notes, write letters or be able to make legal filings as revenge for me reporting the staff for breaking the law, breaking policy, filing grievances and for attempting to pursue a 1983 case against Tim Helder, Washington County and numerous deputies of the Washington County Sheriff's Department.

*Id.*, p. 4. This entry elicited the following response the next day from Defendant Mulvaney,

Sir, this video will not be saved. You did not "have to" trade your meal for a pencil. That is a decision you made. You did request a pencil through the KIOSK 2-3 days prior to submitting this one. You were given a response by Sgt. Foster saying you

---

[7] Plaintiff submitted at least three more kiosk entries on February 6, 2022, regarding his requests for pencils. (ECF No. 43-3, pp. 20, 21, 22).

would get one. I have no idea if this happened or not. The day you submitted this
one, 2-6-22, indigents were passed out later this same day, and you should have
gotten one then as well. It is not an intentional practice that the officers may not
have gotten to get you a pencil when asked in person. Due to the current numbers
of detainees vs. working staff things may be forgotten about with all the other
mandated duties that must be done. As for you filing your 1983 complaint this will
not keep you from doing it. Do you even have any idea how long you have to file
that complaint? Cpl. Mulvaney

*Id.*, p. 5.   Plaintiff again asked for a pencil on February 7, 2022.   *Id.*, p. 6.   The next day,

February 8, 2022, Justin Alderson responded, saying,

Spoke with Cpl. Corley and he has advised me that they gave you a pencil
yesterday. If this is not a factual statement please let me know and I will personally
bring you one. Thanks Cpl Alderson

*Id.*   Plaintiff replied that same day, writing:

Alderson, I was not given a pencil yesterday. I ask every guard for a pencil every
time they come in and I've been given 2 pencils in the last several weeks. Foster
said I would be given a pencil a few days ago and I was not. The report that I was
given a pencil yesterday is false. I would like regular consistent access to a sharp
pencil by whatever means.

*Id.*, p. 7.   Alderson again responded that same day, writing: "[d]elivered at 0812 on 2/8/2022.

Thanks Cpl Alderson." *Id.*   On February 8, 2022, at 9:35 am, Plaintiff wrote, in pertinent part:

I would like for this to serve as a grievance since I am limited to 3 grievances and
I am at my limit and my current grievances have not been addressed. . .. I have also
been denied access to a writing impliment [sic] and today Mulvaney suggested that
I purchase colored pencils off of the commissary, which I have no ability to
sharpen, in order to write with. I find this an absurd solution to my problem
considering the cost, the inability to refresh them through sharpening and the fact
that the department has boxes of pencils available, there is an obvious refusal to
allow me consistent access to a functional writing impliment [sic]

*Id.*, p. 8.

Also on February 8, 2022, Plaintiff wrote:

Mulvaney, please save the video of the door of B- Pod from today at approximately
11:20 AM today showing Deputy Redmond pull his mask down and holler directly

into my face as I was asking if he could exchange my dull pencil. II should be noted that he stated he does not have access to pencils. Please also save the video from 11:21 AM today showing my interaction with deputy Rollins where I asked him to exchnage [sic] my dull pencil but he stated that it is not part of his duties to deal with pencils.

*Id.*, p. 13.     Defendant Mulvaney responded on February 9, 2022, saying,

Sir, Please do not add new requests to one that has already been responded to. This video has been saved as well. That being said, you walked right up to Dep. Redmond, and you could have backed off yourself. He very briefly pulled his mask down so he could call out for a detainee. Also, both Redmond and Rollins are Transport Deputies, not detention deputies, and are not required to provide you with pencils or a sharpener. Cpl. Mulvaney

*Id.*, p. 13.     Plaintiff wrote a third grievance on February 8, 2022, saying:

Mulvaney, please save the video from B-pod at 6:40 PM Yesterday showing me trading my food for a pencil. Also, please save the video from the door at approximately 8:00 PM at med call where I asked a no name tag guard for a pencil, the video at 9:20 PM where I asked Pruitt for a pencil and the video from 11: 12 PM where I asked the no name tag guard for a pencil. I am a pro-se defendant and am being denied a writing impliment [sic] by county policy and as retaliation for reporting the Washington County Sheriff' Deputies for their unlawful actions. I would like consistent access to a sharp pencil as a basic right. I am being denied my access to the court and being denied the ability to defend myself and to file a 1983 against Tim Helder, his deputies, and Washington County.

*Id.*, p. 14.     On February 9, 2022, Defendant Mulvaney responded to this submission, as well,

writing:

Sir, Again ... this video will not be saved. I am not required to saved video because you traded your food away. Also, bartering between detainees is a rule violation and can be punishable by disciplinary. I am not required to follow you around on video to try and find something either. The video if saved will not prove anything as there is no audio to hear what your even saying. Cpl. Mulvaney

*Id.*, p. 14.     Plaintiff entered his fourth kiosk submission on the topic of pencils on February 8,

2022, writing:

The 2 pencils I was given this morning by Corporal Alderson have been used up and are unrenewable. gave one to deputy Montano at 11 :42 AM this morning when

14

he and Threet were doing stripes and they assured me they would swap it out today for a new one. This did not happen despite me asking Montano at 2:00 PM when he brought in cleaning supplies at 2:30 PM and again at 5:13 PM. I asked Threet around 1 :00 PM and at 2:45. I asked Drumright at dinner call this evening at 6:51 PM and he said "you get a pencil with indigent". I have a dull pencil to exchange and I am going to make every attempt, but If I do not have access to a writing impliment [sic] I am going to be forced once again to trade away my food for one.

(ECF No. 43-3, p. 15).[8]   Capt. Kevin East responded that same day, saying, "[t]he POD has been notified of your request. You have complete control of what and what you do not do with your food. I would suggest you don't trade it . . .." *Id.*   On February 10, 2022, Defendant Ake wrote, "Sir you have been provided several pencils over the last four days. We exchange pencils on Sunday when we do indigents. You can exchange your pencils at that time." (ECF No. 43-3, p. 25).

On September 16, 2022, Plaintiff wrote,

Can I please get access to a pencil sharpener? I sm [sic] doing an immense amount of writing due to the many legal actions I'm involved in and have no way to sharpen my pencils. It seems like a complete waste to throw away pencils after one use and I have had (well documented) trouble getting pencils from the floor staff regularly, as they are already very busy with their normal tasks. What I would loke to propose is that a pencil sharpener be brought, perhaps durimg [sic] food tray collection time, to allow me to sharpen a few pencils. This should be something that could be managed similar to the nail clippers. Thanks

(ECF No. 43-3, p. 35).

On September 20, 2022, Cpl. Benjamin Velasco wrote: "If your request is a sharp pencil, you can request a new pencil but I do not have a sharpener."   (ECF No. 43-3, p. 36).   On September 30, 2022, Plaintiff submitted another kiosk request for pencils, writing:

Can I please get a few pencils, I have been asking the floor guards for the last 2 weeks and have not received any. Also, Rex said he may have access to a pencil

---

[8] Plaintiff entered additional kiosk submissions on February 8, 2022, regarding his request for a sharp pencil.   *See, e.g.*, (ECF No. 43-3, p. 26).

sharpener, which would be less wasteful. I've written 14 pages of legal paperwork today alone and am going to need to sharpen the pencils I have or get new ones. Thanks.

(ECF No. 43-3, p. 37).

### *Writing Paper*

According to Defendant Ake, the "WCDC provides inmates who are indigent with indigent supplies (usually each Sunday)."   (ECF No. 43-8, p. 4).   "The indigent pack" includes "hygiene items and correspondence items including a small pencil, several sheets of paper, and two stamped envelopes."   Further, "[p]aper is and has been available for purchase on commissary.   A pad of paper sold on commissary contains roughly 50 pages of paper.   Inmates are allowed to keep this paper in their cell provided it is not used for improper purposes, including but not limited to creating a messy or dangerous environment, covering lights, windows or air vents, concealment of contraband, and flooding or fire dangers." (ECF No. 43-8, p. 5).

On May 2, 2022, Plaintiff filed the following grievance: "I need writing paper and the commissary has been out of stock for 3 weeks. I have to have a way to write letters and file court papers."   (ECF No. 43-3, p. 33).   Daniel Giertz responded the next day, writing, "ok, I have some paper sent up to you. Thank you."   *Id.*

On May 4, 2022, however, Plaintiff wrote the following:

Daniel said that he gave paper to Corley yesterday to give to me. Yesterday Eoff told me that I could not have the paper that I am not indigent, that I should order it on the commissary. I told him that commissary has been out of stock for 3 weeks and that's why Daniel brought it to me. Eoff said "not my problem." I am intentionally being blocked from filing court actions, one more aspect of the ruthless conduct of the sheriff's deputies against me for exposing their violations of law and policies as well as the many failures of the individuals and the entire department.

16

*Id.*, p. 34.

In response, on May 9, 2022, Sgt. Joseph Malone wrote: "I believe this is the paper I provided you on 05/07/2022.   Is that correct?" *Id.*   To which Plaintiff replied on May 10, 2022, writing, "yes. several days after I filed the grievance." *Id.*

### *Retaliation*

Plaintiff says that Defendant Rollins and Deputy Edens came into Q-block on August 2, 2022, to facilitate attorney/detainee meetings via ZOOM.   (ECF No. 1, p. 19).   Plaintiff says that he witnessed Defendant Rollins fill out paperwork on behalf of a detainee during one of these meetings and started talking to another detainee about what he had observed.   *Id.*   According to Plaintiff, Defendant Rollins responded by coming up to his cell, where they stood "face to face at [his] door." *Id.*   Plaintiff describes the encounter as follows: "[Defendant Rollins] was red faced and furious and yelling at [him] to shut [his] mouth.   [Plaintiff] told him that he was a disgrace to law enforcement, and he reared back and punched the window right in [his] face and told [him] [he'd] better shut the hell up or he'd shut [him] up." *Id.*   Plaintiff says that Defendant Rollins then "stood outside of [his] door for the next 10 minutes or so to ensure [he] didn't speak while [Deputy] Edens conducted the next meeting with [a detainee] and the public defender." *Id.*.

For their part, Defendants submitted two surveillance videos of the events in question.   *See* (ECF No. 43-6).   This video shows Defendant Rollins walking to Plaintiff's cell, facing the cell, standing there for approximately fifteen seconds, during which time he briefly bends his right forearm, and then turning around and standing outside of Plaintiff's cell, facing the common area, for approximately fifteen minutes. (ECF No. 43-6, C6; 8-2-22; 1430-1500 Hrs.Rollins.mp4).[9]

---

[9] While there is a second video, *see* (ECF No. 43-6, A6; 8-2-22; 1424—1458 Hrs.), this video does

17

During this time, the video shows Defendant Rollins at times leaning against the railing, overlooking the common area where the Deputy Edens is conducting the attorney/detainee zoom meeting.   Defendant Rollins moves from this position after the conclusion of this meeting.   *See id.*

**B.  Excessive Force Claims**

***Defendant Eoff***

Plaintiff says that on March 29, 2022, at approximately 1:30 pm, Defendant Eoff physically struck him in the back with his shoulder and elbow when he was exiting the doorway out into the yard.   (ECF No. 1, p. 17).   On April 1, 2022, Plaintiff submitted a grievance about this incident, generally describing the same physical contact.   (ECF No. 43-3, p. 30).

Plaintiff says that on April 23, 2022, Defendant Eoff and Deputy Vasilopulos were again escorting him through the jail.   *Id.*   According to Plaintiff, he was concerned that Defendant Eoff would again "physically assault" him so he asked Defendant Eoff to "keep his distance."   *Id.*   Plaintiff claims that Defendant Eoff became "verbally aggressive telling [him] to shut up and keep walking."   *Id.*   Plaintiff says that while he made "numerous attempts to create a small cushion of distance in order to prevent any 'accidents,' as [they] passed through the doorway into A-pod where camera coverage is not very good, [Defendant Eoff] stepped on the back of [his] bare ankle and heel with his steel combat boot."   *Id.*   Plaintiff says that he immediately complained, but Defendant Eoff denied it was intentional.   *Id.*

Defendant Eoff did not submit an affidavit in support of Defendants' Motion for Summary Judgment.   *See generally* (ECF No. 43).   But Defendants submitted security footage of the

_____

not capture any of the events taking place at Plaintiff's cell.

alleged incidents of excessive force.   *See* (ECF No. 43-6).   There are four videos the March 29, 2022, alleged incident of excessive force.   *Id.*   The first video captures Defendant Eoff and Deputy Vasilopulos (neither of whom are wearing WCSO uniforms) opening Plaintiff's cell; Defendant Eoff stepping into the cell; [10] Defendant Eoff stepping further into the cell approximately thirty seconds later so that he is no longer visible on the security video; after approximately one minute into the video, Plaintiff is walking out of his cell carrying his mattress, Defendant Eoff follows him out, uses his hand and touches Plaintiff's shoulder, getting Plaintiff's attention; Defendant Eoff then reaches for Plaintiff's mattress and Plaintiff pulls the mattress back and then brings it forward to give it to Defendant Eoff, Defendant Eoff then appears to direct (there is no sound) Plaintiff to walk ahead of them, and the three proceed out of the view of the camera. (ECF No. 43-6, OS Q-Blk; 3-29-22; 1316-1318).   The video from inside of Plaintiff's cell during this period shows Plaintiff urinating, the two deputies entering the cell after he is finished urinating, Plaintiff folding up his mattress, exchanging words with the deputies, putting on his WCDC-issued shirt, continuing to engage with the deputies, Defendant Eoff walking closer to Plaintiff, using his hand to point at the mattress and then stepping aside so that Plaintiff could walk outside of his cell carrying his mattress.   (ECF No. 43-6, OS 1, 3-29-22; 1316-1318 Hrs.).   This video also depicts Defendant Eoff reaching out, touching Plaintiff's shoulder with his hand, and Plaintiff turning in his direction.   The next video shows Plaintiff and the two deputies behind him walking towards a

---

[10] While the specific identities of the deputies are not clear from the video itself, based on Plaintiff's claims, the Court understands the deputy who walked into Plaintiff's cell to be Defendant Eoff because he is also the deputy who contacted Plaintiff's shoulder when he walked into the yard. Defendant Eoff and Deputy Vasilopulos are sufficiently distinct in build and physical characteristics, including hair color, to allow the Court to differentiate their conduct throughout the four videos.

door.   (ECF No. 43-6, A-Pod yard hallway; 3-29-22; 1317-1319 Hrs.).   Although the deputies and Plaintiff are exchanging words, there is no audio, so it is not possible to determine what is being said.   *Id.*

When the trio gets to the door, one of the deputies walks ahead and pushes the door open, and Plaintiff walks outside.   *Id.*   Given the camera's distance to the outside door and the bright light shining from the outside, what happened next is not clear, but it is possible to see the deputy who opened the door lean slightly forward.   The door then remains open for approximately fifteen to twenty second until both deputies come inside, shut the door behind them, and walk down the hallway.   *Id.*   The fourth video is pointed in the direction of the door from the A-Pod yard.   (ECF No. 43-6, A-Pod Yard; 3-29-22; 1317-1320 Hrs.).   It shows the door swinging open, Plaintiff walking outside, and Defendant Eoff following Plaintiff, making brief contact with Plaintiff's shoulder with his shoulder as he walks backwards to the end of the yard, exchanging words with Plaintiff, then walking forwards back towards the door, turning around, walking backwards again, and then exiting the yard.   *Id.*

There are three videos depicting the April 23, 2022, incident. The first video shows the Defendant Eoff (who is wearing his uniform), Plaintiff, and Deputy Vasilopulos exiting a hallway. (ECF No. 43-6, Y to A-pod; 4-23-22; 1422-1423 Hrs.).   Defendant Eoff takes the lead, pushes the door open, followed by Plaintiff and then Deputy Vasilopulos.   *Id.*   Defendant Eoff holds the door open for Plaintiff, and then Deputy Vasilopulos proceeds to hold the door as the three exit the hallway.   *Id.*   The second video shows Defendant Eoff opening a door, waiting for Plaintiff to walk through, walking behind Plaintiff, followed by Deputy Vasilopulos.   (ECF No. 43-6; Y from B-Pod; 4-23-22; 1422-1423 Hrs.). The third video again shows Defendant Eoff opening a

door, Plaintiff walking through that door, followed by Deputy Vasilopulos.   (ECF No. 43-6, A-Pod hall from Y; 4-23-22; 1422-1423 Hrs.).   Defendant Eoff is walking next to Plaintiff, and Deputy Vasilopulos is walking behind the two.   *Id.*   In all three videos Plaintiff is wearing his WCDC-issued jumpsuit, socks, and orange slides, he is carrying a stack of papers under one arm and holding a mug in his right hand.   None of the videos show either deputy make any physical contact with Plaintiff.

### *Defendant Cradduck*

Plaintiff says that on Mach 31, 2022, Defendant Cradduck refused to accept his mail and "when [he] asserted [his] rights verbally, [Defendant Cradduck] struck [him] in the sternum with his fist and knocked [him] down."   (ECF No. 1, p. 6).

Defendant Cradduck did not submit an affidavit (ECF No. 43), but Defendants submitted security footage of the incident.   (ECF No. 43-6, ISO 1; 3-21-22; 1434-1436 Hrs.).   This video shows Plaintiff talking to a deputy through an eye-level slot in his cell door, holding an envelope up for the deputy to see, and then the door swinging open.   *Id.*   Plaintiff licks an envelope and an exchange proceeds between Plaintiff and another deputy who cannot be seen on the video.   *Id.* Plaintiff continues to show the deputies the letter, and then walks into the far corner of his cell, towards the security camera.   *Id.*   Another deputy comes in, sweeps, and then leaves.   *Id.* Plaintiff continues to exchange words, flaying his arms, showing the letter.   *Id.*   Plaintiff moves from his position and paces in the cell but moves back into the far corner of his cell when the deputy comes back with a mop.   *Id.*   Before that deputy starts to mop, Defendant Cradduck enters Plaintiff's cell, he is holding an envelope in his right hand, and using his right hand to point to where Plaintiff has been directed to sit.   *Id.*   As Plaintiff moves to that location, Defendant

21

Cradduck moves the envelope to his left hand, touches Plaintiff with the fingertips of an open hand, pushing Plaintiff to a sitting position.  *Id.*  Plaintiff remains seated while the deputy mops his cell, exchanging words with the deputies until they leave after they finish mopping.  *Id.*

## LEGAL ANALYSIS

To establish a claim under 42 U.S.C. § 1983, "a plaintiff must allege a violation of a constitutional right committed by a person acting under color of state law."  *Andrews v. City of West Branch, Iowa*, 454 F.3d 914, 918 (8th Cir. 2006).  "Public servants may be sued under section 1983 in either their official capacity, their individual capacity, or both." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) (citing *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997)).  Here, Defendant Ake is being sued in his individual and official capacity as an agent of Washington County.  *See* (ECF Nos. 8, 11).  All other Defendants are being sued only in their individual capacities.   The undersigned addresses the individual capacity claims first.

### A.  Individual Capacity Claims

Defendants contend they are entitled to qualified immunity on Plaintiff's individual capacity claims.  (ECF No. 41).  "Qualified immunity shields officials from civil liability in § 1983 actions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019).  "Qualified immunity analysis requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Id.* (quoting *Nord v. Walsh Cty.*, 757 F.3d 734, 738 (8th Cir. 2014)).  "Unless both of these questions are

answered affirmatively, [a defendant] is entitled to qualified immunity." *Id.*  "And courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Id.*

### First Amendment

As noted above, Plaintiff's First Amendment claims concern: (1) mail delivery (claim one); (2) access to a writing implement (claims two, three, and four); (3) access to writing paper (claim five); and (4) retaliation (claim six).  *See* (ECF No. 1).

"A prison inmate retains those First Amendment rights that are not 'inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'  These include the right to communicate with persons outside of the prison walls, subject to regulation that protects legitimate governmental interests." *Yang v. Missouri Dept. of Corr.*, 833 F.3d 890, 894 (8th Cir. 2016) (citing *Procunier v. Martinez*, 416 U.S. 412-13 (1974)).

"When a prison regulation impinges on an inmate's ability to communicate with others, it is valid if it is 'reasonably related to legitimate penological objectives.'" *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89, 99 (1987)).  In determining whether a regulation is reasonably related to legitimate penological interests, federal consider the four so-called "*Turner* factors:" "(1) whether the regulation is rationally connected to a legitimate and neutral governmental interest; (2) whether the inmate has an alternative means of exercising the constitutional right; (3) the impact accommodating the inmate's asserted right would have on prison staff, prisoners, and resources; and (4) whether ready alternative to the regulation exists."  *Id.* (citing *Turner*, 482 U.S. at 89-91).

### i.   Outgoing Mail Delivery

As a threshold matter, the WCDC policy on outgoing detainee mail differentiates between

"privileged" and "general" correspondence.   (ECF No. 43-7, p. 6).   The WCDC policy on "privileged" mail, defined to include mail between a detainee and an attorney, provides that such mail "shall not be opened and inspected in any manner, unless reasonable suspicion exists that the letter poses a threat to the security of the facility or a threat to the recipient."   (ECF No. 43-7, p. 6).   At issue here is Plaintiff's mail to JaNan Thomas, a lawyer.   Because such correspondence constitutes "privileged mail" pursuant to WCDC policy, this Court applies the four-factor *Turner* analysis to WCDC's privileged mail policy.

Regarding the first *Turner* factor, it is well established that "[w]hile prisoners have a right to send and receive mail, prison officials have a legitimate interest in monitoring that mail for security reasons."   *Ortiz v. Fort Dodge Corr. Facility*, 368 F.3d 1024, 1026 (8th Cir. 2004) (listing cases).   Plaintiff challenges Defendants' contention that the letters he intended to mail to Ms. Thomas constituted a security risk, considering that the purported contraband was not confiscated, but rather the mail was returned to him unopened.   (ECF No. 54, p. 6).   The fact that his mail was not confiscated, however, does not mean that the WCDC's policy of screening privileged mail reasonably suspected of containing contraband is not rationally related to WCDC's interest in lessening security risks at the WCDC.   *See Ortiz*, 368 F.3d at 1027 (citing *Herlein v. Higgins*, 172 F.3d 1089, 1091 (8th Cir. 1999) (*Turner* does not require "actual proof that a legitimate interest with be furthered by the challenged policy," only that the interest being served, and the policy have an "objectively rational" connection).

The second *Turner* factor considers whether the inmate has another way of exercising his constitutional right, here, communicating with opposing counsel.   It is undisputed that Plaintiff's December 7, 2022, letter to Ms. Thomas contained "a sample of the sewage out of the expansion

joints in the [WCDC] floor."   (ECF No. 43-3, p. 41).   Similarly, it is undisputed that the

December 8, 2022, letter contained "biscuit crumbs, hair, trash, general filth, [and] more fresh

grime out of the expansion joints."   (ECF No. 43-3, p. 45).   The purpose of this communication,

it seems, was to provide Ms. Thomas with evidence of his claims in other pending lawsuits.   *Id.*

But there were other avenues available to Plaintiff to communicate this information – he could

have called her on the phone or written her letters describing the evidence he had collected without

including the evidence itself.   Indeed, it is undisputed that Plaintiff mailed several other pieces of

correspondence to Ms. Thomas that had not been intercepted or returned to him as undeliverable.

*See* (ECF No. 43-4, p. 17, 21, 25, 30).[11]

It is undisputed that the December 9, 2022, letter included a copy of his "Motion for

Restraining Order . . . and a few notes explaining that [WCDC officials] were violating [his] rights

some cited case law and a note that said 'have a nice day,' with a smilie [sic]."   (ECF No. 43-3,

p. 39).   Body camera video of the incident shows Plaintiff opening the mail in officers' presence

revealing that each "note" was rolled up and folded into the copy of the motion for a restraining

order.   *See* (ECF No. 43-6, Bilbrey Body Cam #1, Phipps Body Cam #2).[12]   Considering the way

in which Plaintiff packaged his mail to Ms. Thomas, Plaintiff has not demonstrated that it was

unreasonable for WCDC officials to direct Plaintiff to open the mail in their presence to inspect it

for contraband.   *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (burden is on the prisoner to

disprove the validity of a prison regulation).   Again, there were other avenues available for

Plaintiff to communicate this information to Ms. Thomas, to wit, he could have folded his

---

[11] Specifically, Plaintiff's mail logs show that an outgoing letter was mailed to Ms. Thomas on
November 28, 2022, and December 1, 2022.   *See* (ECF No. 43-4, p. 30).
[12] There is no audio for approximately the first thirty seconds of each video.

correspondence to Ms. Thomas flat so that from the outside, the envelope appeared to contain only paper, and not some other, potentially prohibited item.

The third and fourth *Turner* factors "call for an evaluation of the alternatives to the existing regulation and their impact on the prison, inmates, and non-inmates." *Ortiz*, 368 F.3d at 1027. "If a ready alternative to the challenged prison regulation exists, the regulation is invalid. The alternative, however, must not impose more than a de minimis cost on the prison system." *Id.* In this case, Plaintiff suggests that his mail to defense counsel should have been considered "general correspondence" under WCDC policy and therefore not subject to being "opened, inspected or censored in any matter unless it is believed it contains escape plans or information." (ECF No. 54, p. 6). Since, according to Plaintiff, it would be nonsensical to believe that his correspondence to defense counsel contained prison escape plans, Defendants violated WCDC policy in returning his mail undelivered on December 7, 8, and 9, 2022, and therefore violated his constitutional rights. *Id.* The Court disagrees.

As a threshold matter, to the extent that Plaintiff claims that the Defendants violated their own policy, a violation of policy does not, in and of itself, constitute a constitutional violation. *See Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) ("[T]here is no § 1983 liability for violating prison policy. [Plaintiff] must prove that [defendant] violated his constitutional right[s] . . .."). Second, while the Eighth Circuit defines privileged mail more narrowly, as "mail to or from an inmate's attorney and identified as such," *id.*, this does not mean that WCDC's treatment of "privileged mail," as applied here to Plaintiff's opposing counsel, (ECF No. 43-7, p. 6), is unconstitutional.[13] Indeed, the Eighth Circuit has held that officials are justified in screening

---

[13] The question of the constitutionality of WCDC's policy as applied to outgoing privileged

outgoing nonlegal mail for contraband and threats. *See, e.g.*, *Smith v. Delo*, 995 F.2d 827, 832 (8th Cir. 1993). "Nonlegal mail" includes the mail at issue here – mail to *opposing* counsel. *See Gardner*, 109 F.4d at 430. Put differently, the WCDC's definition of "privileged" correspondence does not dictate whether it is considered "legal" mail for the purposes of determining its constitutionality; rather, the focus is on the nature of the mail itself. *Id.* Accordingly, Plaintiff has not demonstrated that the WCDC's policy of inspecting outgoing mail to opposing counsel where (as here) there is "reasonable suspicion that the letter poses a threat to the security and order of the facility or a threat to the recipient," (ECF No. 43-7, p. 6), is unconstitutional. Defendants Allen, Granados, and Pineada are thus entitled to qualified immunity for applying this policy and returning Plaintiff's mail to him on December 7, 8 and 9, 2022, respectively, on the grounds that there was reasonable suspicion that the mail contained contraband. Plaintiff's claim (claim one) should be dismissed without prejudice.

### ii.    Access to Pencils and the WCDC "Pencil Policy"

During the events giving rise to Plaintiff's claims, there was no official, written policy on non-indigent detainees' access to writing implements.[14]   *See* (ECF No. 43-7). Instead, it is undisputed that non-indigent detainees were directed to request pencils (and a pencil sharpener) from floor guards and that floor guards were "encouraged," but not "required," to exchange pencils with detainees (hereinafter "WCDC's pencil policy"). *See* (ECF No. 43-8); (ECF No. 1, p. 13).

---

correspondence to a detainee's *own* attorney is not presently before the Court.

[14] While indigent inmates receive an indigent "pack," which includes "hygiene items and correspondence items including a small pencil, several sheets of paper, and two stamped envelopes," (ECF No. 43-8, p. 5), it is undisputed that WCDC officials did not consider Plaintiff to be "indigent."   (ECF No. 43-1, p. 5).

Access to a method to communicate, such as a writing instrument, plainly implicates the detainees'
right to communicate with persons outside of the prison walls.  *See Yang*, 833 F.3d at 894.
Indeed, the Defendants admit that "pencils are considered necessary and must" be provided in the
jail.  (ECF No. 43-8, p. 2).  Accordingly, this Court analyzes the WCDC's unofficial "pencil
policy" using the *Turner* factors to determine whether the policy is reasonably related to a
legitimate penological interest.  *Id.*

### a. *Turner Factors*

The first *Turner* factor requires the Court to consider whether this policy is rationally
connected to a legitimate governmental interest.  Defendant Ake says that the WCDC permits
inmates to use the small pencils because "they are better writing instruments [than 'flex pens or
flex pencils'] that do not bend when used for writing, and because the size of the pencils
(approximately three inches or less) limits the ability to use the pencils as weapons against inmates,
staff, or others."  (ECF No. 43-8, p. 2).  Because even the "small pencils can be used as
contraband for prohibited uses such as tattooing," "inmates are generally allowed three or four
pencils – provided they are being used for writing purposes and not being used or hoarded for an
improper use or purpose."  *Id.*, p. 3.  Further, the practice of encouraging detention officers to
"exchange" pencils, "limits the instances of hoarding excess materials by removing the unused or
unusable item from the area at the same time the new item is introduced."  *Id.*  Thus, the Court
finds that the WCDC practice of requiring non-indigent inmates to obtain pencils from detention
officers is reasonably related to the WCDC's interest in maintaining a safe and secure facility free
from contraband and limiting access to weapons.

The second *Turner* factor asks whether the inmate has an alternative means of exercising

28

the constitutional right.   Here, it is undisputed that "colored" pencils were available for purchase at the commissary.   (ECF No. 43-3, p. 2).   Further, there are no facts to suggest that Plaintiff did not have access to the telephone to call the people with whom he wanted to communicate.   There is also some indication in the record that Plaintiff could (and did) correspond via email.   *See, e.g.*, (ECF No. 53-1, p. 2).   Finally, while Plaintiff claims that "[d]efendants denied [him] access to pencils for over a year, so [he] got by only by violating policies which prohibited trade/bartering." (ECF No. 53-1, p. 1), this assertion is plainly exaggerated.   The record establishes, for example, that on February 8, 2022, Cpl. Justin Alderson personally gave Plaintiff two new pencils.   (ECF No. 43-5, p. 2); (ECF No. 43-3, p. 15).   *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contracted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").   While Plaintiff asserts (and Defendants do not challenge) that he bartered and traded with other inmates in violation of WCDC policies to obtain pencils, *see* (ECF No. 43-3, p. 4), the fact remains that there were alternative means available to Plaintiff to exercise his First Amendment right – namely, contacting people on the telephone, purchasing colored pencils from the commissary, and waiting for a "pencil exchange" with a detention officer – that did not require him to violate those policies. [15]

---

[15] There is also a clear fact dispute about whether these pencils were available for purchase on commissary as early as February 2022.   Defendant Ake asserts that "small pencils were made available for purchase on the commissary [in February 2022].   The small pencils remain available for purchase from commissary at the time of this affidavit [February 27, 2024]."   (ECF No. 43-8, p. 5).   Plaintiff, however, maintains that "[f]rom November 18, 2021 until Jan 17, 2023, [he] struggled to acquire pencils at the WCDC.   They were not sold on the commissary at any point during that time and were not available to me for free because I was not considered indigent." (ECF No. 53-1, p. 1).   He says that regular pencils were not available for purchase on the commissary until February 2023.   Id., p. 3.   Plaintiff's grievances, moreover, indicate that he

Regarding the third and fourth *Turner* factors, as noted above, "[i]f a ready alternative to the challenged prison regulation exists, the regulation is invalid.   The alternative, however, must not impose more than a de minimis cost on the prison system."   *Ortiz*, 368 F.3d at 1027.   Plaintiff proposes that detention officers either immediately provide pencils or a pencil sharpener upon request, (ECF No. 43-3, p. 6), or that they bring a pencil sharpener during food tray collection time.   (ECF No. 43-3, p. 35).

Defendants counter that allowing detainees to "hoard" too many pencils is a security risk, because "even small pencils could be used as contraband for prohibited uses such as tattooing," (ECF No. 43-8, p. 3), and that they could be used "for improper purposes, for defacing county property, or as a weapon.  *Id.,* p. 4.   Defendants also contend that pencil sharpeners can be "broken or taken apart to provide access to the sharp blade inside."  *Id.*   Furthermore, Defendants assert that while detention officers are "encouraged" to exchange pencils, other job responsibilities may take priority, interfering with their ability to do so.  *Id.*, pp. 3-4.   Thus, while Plaintiff's proposed alternatives – requiring the WCDC to provide an "on-demand" stream of pencils and access to a pencil sharpener or adding to the WCDC detention officer's daily responsibilities – may place more than a *de minimis* cost on the institution, more obvious alternatives exist, namely, making these pencils available for purchase on the commissary, or, even more to the point, requiring (rather than simply encouraging) floor guards to exchange pencils with non-indigent detainees at the same time they distribute the "indigent packets" (usually each Sunday).  *See* (ECF No. 43-8, p. 4).

---

requested pencils (or a pencil sharpener) from detention officers in September 2022, and that in response to those requests, he was directed to "request a new pencil," as opposed to commissary. (ECF No. 43-3, p. 36).

There is, however, a clear fact dispute in the summary judgment record regarding whether (and when) regular pencils were available on the commissary for purchase. *See supra* n.15.   These potential "ready" alternatives to the WCDC policy of tying a non-indigent inmate's access to a "necessary" item, i.e., a pencil, to a floor guard's generosity precludes this Court from concluding, as a matter of law, that this policy during the events giving rise to Plaintiff's claims did not offend the constitution.

### b.   *"Clearly Established"*

This finding does not, however, end the Court's analysis with respect to Plaintiff's individual capacity claims against Defendants Redmond, Rollins, Montano, Drumright, Tate, Phipps, and Foster for purportedly denying him a pencil upon his request (claim two); against Defendant Ake for purportedly authoring the WCDC pencil policy (claim 3); or against Defendant Mulvaney for purportedly failing to train or supervise WCDC personnel on the WCDC pencil policy (claim four).   Rather, the Court must proceed to step two of the qualified immunity analysis and consider whether Plaintiff's right to a pencil (or writing implement) was clearly established at the time.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   *Thurmond v. Andrews*, 972 F.3d 1007, 1011 (8th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).   Federal courts "do not define clearly established law at a high level of generality."   *Id.* (quoting *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020) (en banc)).   "Rather [courts] look for a controlling case or a robust consensus of persuasive authority. There need not be a prior case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.*

(quoting *Dillard*, 961 F.3d at 1052)).   Defendants contend that there is no controlling case or "robust consensus of persuasive authority" to put them on notice that denying Plaintiff's request for a pencil would expose them to liability.   This Court agrees.   A close and careful review of the case law reveals no case (controlling or otherwise) establishing that denying an inmate a pencil when he requests one violates the non-indigent detainee's constitutional rights where, as here, the only legitimate means for a non-indigent detainee to obtain a regular pencil (or writing instrument) is when a detention officer feels sufficiently encouraged to provide one.   Defendants Redmond, Rollins, Montano, Drumright, Tate, Phipps, and Foster are therefore entitled to qualified immunity for their refusing Plaintiff's request for a pencil, the claim against them should be dismissed (claim two), and they should be terminated from this action.

Defendants Ake (claim two) and Mulvaney (claim three) should also be entitled to qualified immunity, but for a far more basic reason: to establish individual liability under Section 1983, a "plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."   *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Here, Plaintiff asserts that Defendant Ake "is responsible for [the WCDC] pencil policy and it's [sic] failure."   (ECF No. 1, p. 14).   It is undisputed, however, that there is no official written WCDC policy on providing pencils to non-indigent inmates.   *See* (ECF No. 43-7).   Further, Defendant Ake asserts that "[he] was neither authorized nor tasked with policy decisions or development. [And that] [he] did not author or establish the policy or practices regarding the distribution of pencils or paper to detainees in February 2022 that are at issue in this lawsuit." (ECF No. 43-8, pp. 1-2).   These assertions, provided under penalty of perjury, are sufficient to shift the burden to Plaintiff to show that there remains a genuine issue of material fact that needs

to be resolved at trial.  *See* Fed. R. Civ. P. 56(c).   With respect to Plaintiff's claim against Defendant Ake in his individual capacity for being "responsible for" the WCDC pencil policy, Plaintiff has failed to do so.   *See Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) ("[T]o survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.").   Defendant Ake is therefore entitled to qualified immunity for the individual capacity claim against him.

Similarly, with respect to Defendant Mulvaney, Plaintiff claims that he failed to properly supervise or train WCDC officials on the WCDC pencil policy.   (ECF No. 1, p. 21).   In section 1983 actions such as this one, "supervisory liability is limited."   *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).   "A supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity."   *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994).   Rather, "[w]hen a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Davis v. Buchanan Cnty., Missouri*, 11 F.4th 604, 624 (8th Cir. 2021).   Here, however, there is no evidence that Defendant Mulvaney supervised any of the floor deputies.   *See* (ECF No. 43-1, p. 1).   Accordingly, Defendant Mulvaney is entitled to summary judgment on Plaintiff's failure to train or supervise claim. [16]

---

[16]  Notably, even if there was a material fact dispute about the scope of Defendant Mulvaney's supervisory responsibilities of the floor guards (which there is not), Defendant Mulvaney would nevertheless be entitled to qualified immunity because, as described above, there is no clearly

### iii.    Access to Writing Paper

There is no dispute that WCDC provides indigent inmates with several pieces of writing paper; writing paper is also available on the WCDC commissary for purchase.   (ECF No. 43-8, p. 5).   It is also undisputed that when Plaintiff filed a grievance on May 2, 2022, requesting paper because the commissary had been "out of stock for several weeks," Daniel Giertz responded the next day saying that he would make paper available for him, however, Plaintiff did not receive that paper until May 7, 2022, because Defendants Corley and Eoff did not give it to him.   (ECF No. 43-3).   This brief delay does not amount to a constitutional violation.

"[A]llegations of sporadic and short-term delays and disruptions are insufficient to establish a Constitutional violation."   *Evans v. Jones*, Case No. 07-CV-1054, 2009 WL 387111, at *1 (W.D. Ark. Feb. 13, 2009) (citing *Zimmerman v. Tribble*, 226 F.3d 568, 572 (7th Cir. 2000)). Viewed in the light most favorable to Plaintiff, by refusing to provide him with the writing paper that had been earmarked for him, Defendants Corley and Eoff extended the delay in receiving that paper by, at most, a few days.   But the summary judgment record shows that during this delay (from May 3, 2022, to May 7, 2022), Plaintiff mailed at least two letters.   *See, e.g.* (ECF No. 43-4, p. 8).[17]   Further, there is nothing in the record to suggest that he did not have access to the telephone during this period.   Put differently, there are no facts in the record – disputed or otherwise – suggesting that he was deprived of *any means* to communicate while the paper was out of stock or, more to the point, for the few days Defendants Corley and Eoff delayed the delivery

---

established case law or persuasive authority providing notice that failure to provide detainees with a writing instrument upon their demand constitutes a *constitutional* violation.

[17] Indeed, Plaintiff's mail log shows that he mailed letter during the preceding "several weeks" he claims the commissary was out of stock of paper.   (ECF No. 43-4, p. 8).

of his writing paper to him.   Accordingly, on this record, the Court finds that the 3-4 day delay Defendants Eoff and Corley caused by failing to provide him the writing paper that had been earmarked for him is simply *de minimis* and does not implicate the constitution.   *Bell v. Wolfish*, 441 U.S. 520, 539 n.21 (1979) (explaining that "[t]here is . . . a *de minimis* level of imposition with which the Constitution is not concerned); *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (exposure to raw sewage for four days amounts to a *de minimis* imposition and thus does not implicate constitutional concerns).   Defendants Eoff and Corley are therefore entitled to summary judgment with respect to this claim, and this claim should be dismissed with prejudice.

### iv.   Retaliation

Finally, to establish a retaliation in violation of the First Amendment, Plaintiff must "show (1) he engaged in a protected activity; (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing that activity; and (3) the adverse action was motivated at least in part by the exercise of the protected activity."   *Spencer v. Jackson Cnty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).   During the time leading up to Defendant Rollins's allegedly retaliatory conduct, Plaintiff claims (and Defendants do not dispute) that he was talking (from within his cell) to another inmate (who was in an adjoining cell) about what they perceived to be constitutional infirmities with the way in which Defendant Rollins and Deputy Eden were facilitating a detainee/attorney zoom meeting.   (ECF No. 1, pp. 18-19).   It is well established that the "filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity."   *Gonzalez v. Bendt*, 971 F.3d 742, 744-45 (8th Cir. 2020) (quoting *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007)).   By analogy, therefore, this Court finds that inmate *oral* speech expressing

grievances about specific jail practices or policies – in this case how WCDC jail officials conduct attorney/detainee zoom meetings – is a protected activity.

The parties dispute, however, the alleged "adverse action" Defendant Rollins took in response to Plaintiff engaging in protected activity.   Plaintiff describes Defendant Rollins's conduct as follows:

> Rollins came up to my cell and we stood face to face at my door and he was red faced and furious and yelling at me to shut my mouth.  I told him that he was a disgrace to law enforcement and he reared back and punched the window right in my face and told me I'd better shut the hell up or he'd shut me up.  He stood outside my door for the next 10 minutes or so to ensure I didn't speak while [Defendant] Edens conducted the next [detainee/attorney] meeting.

(ECF No. 1, p. 19).

Defendants submitted security video of the interaction.  *See* (ECF No. 43-6, C6; 8-2-22; 1430-1500 Hrs.Rollins.mp4).   Defendants assert that the video, which contains no audio, shows no indication that Defendant Rollins "reared back and punched the window right in [Plaintiff's face]."  (ECF No. 42, p. 34).   Upon the Court's review, the video shows Defendant Rollins walking to Plaintiff's cell, facing the cell, standing there for approximately fifteen seconds, during which time he briefly moves his right arm, and then turning around and standing outside of Plaintiff's cell, facing the common area, for approximately fifteen minutes.  *Id.*   During these fifteen minutes, the video shows Defendant Rollins at times leaning against the railing overlooking the common area where Deputy Edens was facilitating attorney/detainee meetings on behalf of other detainees.   *See* (ECF No. 43-6, C6; 8-2-22; 1430-1500 Hrs.Rollins.mp4).   It is not possible to discern from viewing the video what exactly transpired when Defendant Rollins approached Plaintiff's cell.   This factual dispute is not material, however, because even if, as Plaintiff claims, Defendant Rollins yelled at him, punched his window, and told him to "shut the hell up or he'd

shut [him] up," this conduct would not "chill a person of ordinary firmness from continuing in the activity" of grieving about WCDC policies and procedures.

The "ordinary-firmness test is designed to weed out trivial matter from substantial violations of the First Amendment." *Gonzalez*, 971 F.3d at 729 (citing *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013)). "The test is an objective one, not subjective. The question is . . . [w]hat would a person of 'ordinary firmness' have done in reaction to [the adverse action]?" *Id.* (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003)). "Summary judgment is appropriate if there is insufficient evidence the adverse action would deter a person of ordinary firmness from continuing to engage in First Amendment protected activity." *Id.* This is one such case.

Courts "consider [the plaintiff's] actions in response to [the] alleged retaliation as evidence of what a person of ordinary firmness would have done." *Id.* (citing *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002)). Here, Defendant Rollins's conduct, when viewed in the light most favorable to Plaintiff, may have stopped, and according to Plaintiff, did stop, Plaintiff from complaining about WCDC policies and practices for the short time that Defendant Rollins was physically present directly outside of his cell. (ECF No. 53, p. 3). It is undisputed, however, that it did not prevent Plaintiff from continuing to file grievances about what he perceived to be constitutional inadequacies with WCDC practices and policies, *see* (ECF No. 43-3, pp. 35-46), or write letters to the Fire Marshal, (ECF No. 43-4, p. 14), the Washington County Health Department, *id.*, and then-Chief Deputy Jay Cantrell, *id.*, p. 15, among others. [18]

---

[18] Defendants assert that on August 3, 2022, Plaintiff filed a grievance against Defendant Rollins over this incident. (ECF No. 43, p. 17). Defendants, however, did not include this grievance in their 46-page exhibit of Plaintiff's kiosk submissions. *See* (ECF No. 43-3).

Finally, there is no evidence in the record that Defendant Rollins's purported adverse action was motivated, at least in part, by the content of Plaintiff's speech – i.e., the constitutionality of WCDC policies and practices – versus the fact that Plaintiff's speech (irrespective of content) was interrupting detainee/attorney meetings. Plaintiff's conclusory "belief" that Defendant Rollins reacted with a retaliatory motive is insufficient. *Wilson v. Northcutt*, 441 F.3d 586, 592-93 (8th Cir. 2006). Defendant Rollins, therefore, is entitled to qualified immunity, the claims against him should be dismissed with prejudice, and he should also be terminated from this action.

### *Excessive Force*

Plaintiff asserts three instances of excessive force: two by Defendant Eoff on March 29, 2022, and April 23, 2022, and one by Defendant Cradduck on March 31, 2022. (ECF No. 1, pp. 5, 17). Defendants dispute that force was used, stating that that even if force was used, it was not objectively unreasonable. (ECF No. 42, p. 36).

In considering excessive force claims brought by pretrial detainees, "a pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). Courts do not apply the objective-reasonable standard "mechanically." *Id.* at 397. Instead, a court must adopt "the perspective of a reasonable officer on the scene" and base its analysis on "what the officer knew at the time," without "the 20/20 vision of hindsight." *Id.* at 397.

In determining reasonableness, courts should consider:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id*. This list of factors is not exclusive, however, and a court must consider any other relevant

circumstances. *Id*.

i.     **Defendant Eoff**

Plaintiff says that after weeks of reporting Defendant Eoff's "aggressive nature," on March 29, 2022, Defendant Eoff "shoulder checked" him, striking him in the back with his shoulder and elbow on his way out to the yard, (ECF No. 1, p. 16), and on April 23, 2022, Defendant Eoff stepped on the back of his bare ankle and heel with his steel toe combat boot. *Id.*, p. 17. Defendants, relying on available security footage, dispute that any force was used.   (ECF No. 38).

Upon the Court's review, the security footage does not clearly contradict Plaintiff's claim that Defendant Eoff made physical contact with him on March 29, 2022, and April 23, 2022.   *See* (ECF No. 43-6).   While there are four videos of the March 29, 2022, incident, none of the videos has audio and the relevant events – when Plaintiff and Defendant Eoff are walking out of the building into the yard – are either obscured by the sun or zoomed-out too far to determine with any certainty if physical contact was ever even made. [19]   *Id.*

The dispute about whether any physical contact was made, however, does not preclude summary judgment because this dispute is not material.   Even if Defendant Eoff made physical contact with Plaintiff, the video shows that the physical encounter itself would have been very brief, lasting no more than seconds, and there are no facts to suggest that Plaintiff requested

---

[19] In his response to Defendants' Motion for Summary Judgment, Plaintiff describes Defendant Eoff as "grabbing" him by the shoulder, "spinning" and "shoving" him, and then "aggressively" grabbing and throwing his mat prior to walking him to the yard.   (ECF No. ECF No. 54, p. 12). To the extent that Plaintiff claims this conduct constitutes excessive force, he did not assert the claim in his Complaint.   Accordingly, Defendants did not have an opportunity to respond to it. Such a claim, therefore, is not properly before this Court. *See Northern States Power Co. v. Federal Transit Admin,* 358 F.3d 1050, 1057 (8th Cir. 2004) (explaining the pleading requirements of the Federal Rule of Civil Procedure are "relatively permissive," but they do not allow plaintiffs to assert claims, which were not pled, for the purpose of avoiding summary judgment).

medical attention, or even complained of any injury.  *See, e.g.*, (ECF No. 54, p. 30).   While Plaintiff appears to argue that his earlier grievance about Defendant Eoff's conduct and his previous hostile interactions with Eoff are evidence that Defendant Eoff intentionally or purposefully made physical contact with him on March 29, 2022, *see* (ECF No. 54, p. 29), the Court's excessive force inquiry is an objective one. *See Kingsley*, 576 U.S. at 396-97.   This Court concludes that even if Defendant Eoff made physical contact with Plaintiff, that contact was de minimis and did not rise to the level of a constitutional violation.   *See Webster v. St. Louis Cnty.*, Case No. 23-cv-480 (ECT/LIB), 2023 WL 8559221, at *2 (D. Minn. Dec. 11, 2023) (explaining that a pretrial detainee must show that the force purposefully or knowingly used against him was objectively unreasonable and more than *de minimis*) (citing *Jackson v. Buckman*, 756 F.3d 1060, 1067-68 (8th Cir. 2014)), *appeal filed* (8th Cir. Dec. 11, 2023).

The Court's analysis of the second alleged incident of excessive force by Defendant Eoff leads to the same result.   Plaintiff claims that on April 23, 2022, Defendant Eoff stepped on his bare ankle and heel with his steel toe boots.  (ECF No. 1, p. 17).   Defendants assert that the security video does not show either deputy – Defendant Eoff or Deputy Vasilopulos – stepping on Plaintiff's ankle or heel.   (ECF No. 42, p. 40).   For his part, Plaintiff claims that Defendants did not produce the relevant video.   (ECF No. 54, p. 13).   In any event, there are no facts suggesting that Plaintiff suffered *any* injury, physical or otherwise, from this encounter.   The videos show Plaintiff, Defendant Eoff, and Deputy Vasilopulos opening, and then walking through several doors.   To the extent that physical contact was made with Plaintiff's heel or ankle while walking through one of these doors, there are no facts (disputed or otherwise) to suggest that the physical contact was intentional or purposeful.   Plaintiff's efforts, moreover, to delve into Defendant

Eoff's purported animus towards him ignores that the Court's excessive force analysis must be objective.   Plaintiff's excessive force claims against Defendant Eoff in his individual capacity, therefore, do not survive summary judgment.   Those claims should therefore be dismissed with prejudice, and Defendant Eoff should be terminated from this matter.

### ii.     Defendant Cradduck

Plaintiff says that on March 31, 2022, Defendant Cradduck "refused [his] mail and when [he] asserted [his] rights verbally, [Defendant Cradduck] struck [him] in the sternum with his fist and knocked him down."   (ECF No. 1, p. 6).   Defendants assert that the security video of the incident clearly contradicts Plaintiff's version of events.   (ECF No. 42, p. 42).   This Court largely agrees with the Defendants.

While the video has no audio, Plaintiff asserts (and the Defendants do not dispute) that he was arguing with detention officers because they declined to mail his letter to Defendant Mulvaney, on Defendant Mulvaney's orders. (ECF No. 1, pp. 5-6).[20]   The video is from inside Plaintiff's cell and shows Plaintiff pointing to the letter, gesturing with his hands, trying to give the letter to someone, gesturing with the letter, walking to the corner of the cell (closest to the security camera), and then moving around while a deputy sweeps his cell.   (ECF No. 43-6, ISO 1; 3-31-22; 1434-1436 Hrs.).   During this time there is one deputy holding Plaintiff's door open and it appears that there is at least one other WCDC official outside of the view of the camera.   *Id.*

---

[20] Plaintiff's claim that the Defendants refused to mail his letters to Defendant Mulvaney when, as Plaintiff asserts, Defendant Mulvaney directed them not to accept those letters for mailing was dismissed pursuant 28 U.S.C. § 1915A(b)(1).   *See* (ECF Nos. 8, 11) (citing *Finney v. Arkansas Bd. of Corr.*, 505 F.2d 194, 2011 (8th Cir. 1974) ("If a person does not wish to receive prisoner mail, he may so notify the prison, and the prison officials may be justified in refusing to send further mail.").   In any event, the summary judgment record reflects that this letter was, in fact, mailed.   *See* (ECF No. 43-5, p. 6); (ECF No. 43-4, p. 6).

When the deputy finishes sweeping his cell and walks out, Plaintiff moves again, gesturing with the letter. *Id.* It appears that he is talking to a deputy out of the view of the camera. *Id.* He then walks back to the far corner of the cell when the deputy returns with a mop, at this point there are three deputies in the doorway, and one of them comes forward, pointing to a location on the other side of Plaintiff's bed, approximately two large steps away from where Plaintiff was standing. *Id.* Plaintiff moves in that direction, and when he gets to the other side of his bed, this deputy – purportedly Deputy Cradduck – puts his open hand on Plaintiff's chest, pushing him down to his bed. *Id.* Deputy Cradduck keeps his hand up, pointing at Plaintiff while he is seated, he then moves away to allow the deputy to mop the cell. After the deputy is finished mopping, all three deputies leave Plaintiff's cell. *Id.*

While Defendant Cradduck did not submit an affidavit in support of the Defendants' Motion for Summary Judgment, he wrote an incident report following the March 31, 2022, alleged excessive force incident. (ECF No. 43-5, p. 6). In that report, he describes Plaintiff as becoming upset when he would not immediately accept his letter addressed to Defendant Mulvaney. *Id.* According to Defendant Cradduck's incident report, he ordered Plaintiff to sit down multiple times to ensure the safety of the officers because Plaintiff was swearing and becoming "more agitated." *Id.* Defendant Cradduck says that "[Plaintiff] did not sit down so [he] pushed him to the bench. Once compliance was gained, [officers] finished cleaning his cell. [He] then pulled [his] county-issued OC spray and told him to stay seated" until they left. *Id.*[21]

---

[21] Because Defendant Cradduck did not submit an affidavit describing the March 31, 2022, use of force incident, the Court considers his statements within his incident report only to the extent that they address his "then existing state of mind." Fed. R. Evid. 803(3). Notably, however, the Court's excessive force analysis is not subjective. *See Kingsley*, 576 U.S. at 396-97

The video clearly contradicts Plaintiff's statement that Defendant Cradduck "struck [him] in the sternum with his fist and knocked him down."  (ECF No. 1, p. 6).   Thus, consistent with the video, this Court considers whether Defendant Cradduck using an open hand to push Plaintiff onto his cot was objectively unreasonable under the circumstances. *See Scott*, 550 U.S. at 380.

Plaintiff contends that no use of force was necessary because Plaintiff was in the process of sitting down when Defendant Cradduck used force to push him down.   However, the video provides uncontroverted evidence that immediately prior to Defendant Cradduck's use of force, Plaintiff was agitated, and Plaintiff and WCDC deputies, including Defendant Cradduck, had been arguing.   It is further undisputed that Plaintiff was moving around his cell and gesturing with his hands while deputies were trying to complete their duties and clean his cell.   Under these circumstances, the Court finds that Defendant Cradduck's use of force was minimal (a push with his open hand),[22] proportionate to the basis for the use of force (ensuring that Plaintiff sat down while the deputies finished cleaning his cell) and resulted in no physical injury to Plaintiff.  Accordingly, on this record, Officer Cradduck's use of force was objectively reasonable under the circumstances and Defendant Cradduck is entitled to summary judgment on this claim.

Even if Defendant Cradduck's use of an open hand to push Plaintiff onto his cot was unreasonable under the circumstances, Defendant Cradduck would nevertheless be entitled to qualified immunity because Plaintiff's right to be free from such force was not "clearly established" at the time.   Neither party has identified any case law (and the Court has found none) that would put Defendant Cradduck on notice that his circumscribed use of force under these

---

[22] Plaintiff does not claim that Defendant Cradduck used excessive force against him by brandishing his "OC-spray" during this incident.  (ECF No. 1).  This Court, therefore, does not consider whether this use of force was objectively reasonable under the circumstances.

circumstances would amount to a constitutional violation.   Defendant Cradduck is therefore entitled to summary judgment, the excessive force claims against him should be dismissed with prejudice, and he should be terminated from this action.

## B. Official Capacity Claims

This leaves Plaintiff's claim against Defendant Ake in his official capacity for the WCDC pencil policy itself.[23]   "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by the government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Gladden v. Richbourg*, 759 F.3d 960, 968 (8th Cir. 2014) (quoting *Grayson v. Ross*, 454 F.3d 802, 810-11 (8th Cir. 2006)).   "Although there must be an unconstitutional act by a municipal employee before a municipality can be held liable, there need not be a finding that a municipal employee is liable in his or her individual capacity." *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (internal quotations and citations omitted).

As noted elsewhere, it is undisputed that the WCDC pencil policy during the time frame alleged in the Complaint required non-indigent inmates, such as Plaintiff, to request writing pencils from detention officers, who, in turn, were encouraged, but not required, to provide Plaintiff with a pencil or exchange pencils.   *See* (ECF No. 43-8, p. 3).   Similarly, WCDC detention officers could, but were not required to, sharpen inmate's pencils.   (ECF No. 43-8, p. 4).

---

[23] The Complaint claims that "[Defendant] Ake [] is responsible for this pencil policy and it's failure."   (ECF No. 1, p. 14).   Heretofore, this Court has adopted Plaintiff's characterization of the "pencil policy."   Since this Court recommends that the "pencil policy" claim against Defendant Ake in his personal capacity be dismissed with prejudice and because an official capacity claim is the equivalent of a claim against Washington County, the Court will hereinafter refer to it as WCDC's "pencil policy."

44

As described above, a material fact dispute remains whether writing pencils (as opposed to colored pencils) were available for purchase on the commissary in February 2022 or February 2023.   Further, at least two potential "ready alternatives" to this policy exist: (1) making pencils available for purchase on commissary (assuming they were not already available); and (2) requiring (rather than simply encouraging) detention officers to exchange pencils when they distribute "indigent packets" (unusually on Sundays).   Given these possible alternatives, this Court cannot say on summary judgment that the WCDC unwritten "pencil policy" in effect during the timeframe alleged in the Complaint passes constitutional muster, particularly where, as here, Defendants admit that "[p]encils are considered necessary and must be provided in the jail," (ECF No. 43-8, p. 2).   Plaintiff has asserted sufficient factual material, moreover, that he repeatedly requested but was denied a sharpened pencil or access to a pencil sharpener with which he used to "journal, [] write letters, [] file court motions, [] make charts, graphs, and spreadsheets, [] take a lot of legal notes."   (ECF No. 1, p. 14).[24]   Thus, Plaintiff's official capacity claim against Defendant Ake with respect to the WCDC pencil policy should survive summary judgment.

## C. Damages

Because Plaintiff is a prisoner bring suit challenging the conditions of his incarceration, his lawsuit is subject to the Prison Litigation Reform Act ("PLRA").   *See* 42 U.S.C. § 1997e *et seq.* Pursuant to Section 1997e(e) of the PLRA, "[n]o federal action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered

---

[24] Defendants' claim that he was requesting pencils while contemporaneously mailing letters and journaling, for example, *see* (ECF No. 42, p. 21), does not negate the fact that the WCDC pencil policy in force at the time of Plaintiff's claims meant that his ability to do so going forward was dependent upon the good will of a floor deputy willing to exchange pencils with him or sharpen his pencil.

while in custody without a prior showing of physical injury or the commission of a sexual act . . .." 42 U.S.C. § 1997e(e).   "Thus, to recover more than nominal damages under the statute, a prisoner must allege or prove more than mental or emotional injury."   *McAdoo v. Martin*, 899 F.3d 521, 525 (8th Cir. 2018).   Further, courts in this Circuit "interpret the PLRA to require more than a de minimis physical injury." *Id.* (citing *Smith v. Moody*, 175 F.3d 1025, 1025 (8th Cir. 1999) (unpublished per curiam)).

Here, the only claim to survive summary judgment is Plaintiff's official capacity claim against Defendant Ake related to WCDC's pencil policy.   There are no facts in the summary judgment record suggesting that Plaintiff suffered any physical injury from this policy.   Plaintiff's request for damages should therefore be limited to the recovery of nominal and punitive damages alone.

## CONCLUSION

In sum and for all the reasons outlined above, **IT IS RECOMMENDED THAT:**

(a)    Defendants' Motion for Summary Judgment be **DENIED** with respect to Plaintiff's official capacity claim against Defendant Ake for WCDC's "pencil policy" during the timeframe alleged in the Complaint;

(b)    Defendants' Motion for Summary Judgment should be **GRANTED** in all other respects as follows:

*    Plaintiff's claims against Defendants Allen, Granados, and Pineda in their individual capacities for failure to deliver Plaintiff's mail in violation of the First Amendment should be **DISMISSED WITH PREJUDICE**;

*    Plaintiff's claims against Defendants Redmond, Rollins, Montano, Drumright,

46

Tate, Phipps, and Foster in their individual capacities for depriving Plaintiff of a pencil in violation of the First Amendment should be **DISMISSED WITH PREJUDICE**;

    \*     Plaintiff's claims against Defendant Ake in his individual capacity for authoring the WCDC "pencil policy" should be **DISMISSED WITH PREJUDICE**;

    \*     Plaintiff's claims against Defendant Mulvaney in his individual capacity for failing to train or supervise with respect to the WCDC "pencil policy" should be **DISMISSED WITH PREJUDICE**;

    \*     Plaintiff's claims against Defendants Corley and Eoff in their individual capacities for depriving him of writing paper in violation of the First Amendment should be **DISMISSED WITH PREJUDICE**;

    \*     Plaintiff's First Amendment retaliation claim against Defendant Rollins in his individual capacity should be **DISMISSED WITH PREJUDICE**;

    \*     Plaintiff's claims against Defendant Eoff in his individual capacity for his purported use of excessive force on March 29, 2022, and April 23, 2022, should be **DISMISSED WITH PREJUDICE**;

    \*     Plaintiff's claims against Defendant Cradduck in his individual capacity for his purported use of excessive force on March 31, 2022, should be DISMISSED **WITH PREJUDICE**;

    \*     Defendants Pineda, Allen, Granados, Eoff, Cradduck, Rollins, Redmond, Montano, Drumright, Tate, Phipps, Foster, Corley, and Mulvaney should be **TERMINATED** from this action; and

    \*     Plaintiff's request for damages should be limited to the recovery of nominal and

punitive damages.

The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

STATUS OF REFERRAL: Remains referred consistent with these recommendations.

RECOMMENDED this 30th day of July 2024.

*Christy Comstock*
_____
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE